## THE STATE v. COATS, Appellant.

### Division Two, May 19, 1903.

1. **Confession: CORROBORATION.** While the confession of the accused alone without any corroborating circumstances or proof *aliunde* as to the *corpus delicti*, would not be sufficient, yet if with the confession such other facts and circumstances are introduced in evidence, fully corroborating the confession on that particular subject, it is ample to base a conviction upon.

2. **————: INSANITY: INSTRUCTION: FALSE ISSUE.** An instruction on insanity, clearly correct in the abstract, may inject a false issue into the case by being wholly inapplicable to the issues made by the evidence. Defendant had confessed to killing his mother. Outside of his confession there was little evidence to show the *corpus delicti*. The issue was that the confession was not true, and his counsel relied upon an alibi to establish its untruth, and introduced much evidence to show that he was not present at the time he claimed to have committed the crime, and as emphasizing that defense introduced evidence as to his mental condition at the time of making the confession, which was that he was of low intellect. *Held*, that the court was not warranted from the evidence in giving instructions on the question of defendant's insanity at the time the crime was committed, as an excuse for committing the crime, but would have been warranted if it felt that the testimony offered as to his mental condition at the time he made the confession might mislead or confuse the jury, in telling them that there was no evidence of insanity at the time of committing the offense.

3. **————: INDUCEMENT: FORMER TESTIMONY: IMPEACHING ONE'S OWN WITNESS.** A witness at the trial testified that she had not said to defendant that if he would confess "they will turn you loose", and thereupon defendant's counsel, having exhausted her memory, asked to read from the witness's testimony before the coroner's jury in which she had said that she thought she said to defendant in a lengthy conversation she had with him in the presence of an officer to whom he later made the confession that, "If you do" tell the truth about it, "they will turn you loose." *Held*, that this testimony was not only competent, but very important, in determining the truth of the confession, and the weight to be attached to it, and could not be excluded on the theory that it was an attempt by defendant to impeach his own witness. In such case it was immaterial whether the witness was the State's, defendant's or the court's witness.

Appeal from Buchanan Criminal Court.—*Hon. B. J. Casteel*, Judge.

REVERSED AND REMANDED.

*R. L. Spencer, R. L. Nichols* and *L. J. Eastin* for appellant.

(1) (a) When Lizzie Smith was called by the State to prove that the confession was not procured by inducement or duress, she thereby became the State's witness, and the defendant had the right to cross-examine, impeach or refresh her memory, especially with reference to the testimony given by her upon direct examination. Page v. Kankey, 6 Mo. 433; Brown v. Burrus, 8 Mo. 26; Railroad v. Silver, 56 Mo. 265; State v. Brady, 87 Mo. 145; Jones v. Roberts, 37 Mo. App. 176; Walter v. Hoeffner, 51 Mo. App. 50; Dill v. Stegner, 56 Mo. App. 540. (b) Even if the witness had been called by the defendant, he had a right to refresh her memory. Gillett on Indirect and Collateral Evidence, sec. 89. (2) (a) A new trial should have been granted by the trial court upon the newly-discovered evidence. Witness Lizzie Smith says in her affidavit, attached to the motion for a new trial, that after having her memory refreshed by reference to her testimony at the coroner's inquest, the facts detailed by her at the inquest were true, and that if called again as a witness she would swear that she told the defendant that they (the authorities) would turn him loose if he confessed. This affidavit and the evidence attached to it, revealed to the court the prejudicial nature of the ruling which forbade the defendant to cross-examine or refresh the memory of the witness, and he should have granted a new trial that the error might have been corrected. The newly-discovered evidence was amply sufficient. R. S. 1899, sec. 2688; State v. Moberly, 121 Mo. 604; State v. Murray,

91 Mo. 95; State v. Bailey, 94 Mo. 311; Standard Investment Co. v. Hoyt, 164 Mo. 124.    (b)    The evidence shows that the promise made to the defendant by witness Lizzie Smith was made in the presence of police officers, hence her promise came to the defendant with authority.    Greenleaf on Ev., sec. 222; Roberts' Case, 1 Dev. 259; Reg. v. Pountney, 7 C. and P. 302. (c)    Witness Lizzie Smith was first called by the State, in the absence of the jury, for the purpose of showing that the confession was not secured by threats or promises.    After the confession was admitted, the defendant had a right to cross-examine the witness in the presence of the jury, for, while the admissibility of the confession is a question for the court, its truth is a question for the jury.    The court was in error, there-· fore, upon this ground, in refusing to permit a cross-examination of the witness.    (3)    The court erred in permitting the experts called by the State in rebuttal, to give their opinion as to the condition of the defendant's mind at the time the act was committed. This testimony was not in rebuttal of anything proven by the defendant, and defendant's objection should have been sustained.    Babcock v. Babcock, 46 Mo. 243.

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

(1)    The admissibility of confessions was a preliminary question for the trial judge to determine. State v. Kinder, 96 Mo. 550; State v. Duncan, 64 Mo. 262; State v. Parsons, 73 Mo. 696.    (2)    And it appearing that two police officers were within hearing when the defendant confessed to Lizzie Smith, it seemed that the court recognized the rule that, if defendant confessed within the hearing of police officers, any promise she might have made to the defendant was made by the authority of the officers, and, therefore, the court examined her at great length in order that

he might determine, not only the admissibility of the confession made to her, but the subsequent confessions made to other persons. The opportune time for defendant to have disclosed improper means in procuring the confession, if such existed, was when that matter was being determined by the court. "If defendant desired to have his testimony considered by the court, in determining the question whether his admissions, about to be testified to, . . . were voluntary, he should have proffered his evidence when that preliminary question was being tried by the court." State v. Rush, 95 Mo. 203. Again, Lizzie Smith was not a witness for the State. Her testimony was not presented to the jury by the State. She was the defendant's witness. While there are exceptions to the general rule that a party can not impeach his own witness, this record does not disclose where the defendant has brought his witness within any exception. She had testified before the court and had been examined by the court and by the defendant. She had testified fully; and, seemingly, with frankness and intelligence. It can not be claimed that the defendant was even surprised at her testimony. She did not prove unexpectedly hostile. It is not shown that the defendant was misled or entrapped by any unfair artifice or statement made to him, or to his counsel, or to anyone on whom he had a right to rely. The defendant made no offer to show that the witness had testified at the preliminary trial according to the manner that his questions might indicate. He did not offer to show that she told him, or his counsel, or any other person, anything different from what she stated while on the stand. Her failure to meet the defendant's anticipation falls far short of the surprise which the law deems sufficient to permit the relaxation of the rule. State v. Burke, 132 Mo. 363; Underhill on Crim. Ev., p. 288; Hickory v. United States, 151 U. S. 303; Shackelford v. State, 27 S. W. 8; Pressler v. People, 117 Ill. 437.

It will not do to say that defendant had a right to thus examine the witness in order to refresh her memory. The object of counsel seems to have been to call the attention of the witness to the fact whether she did not say to the defendant that he would be liberated if he confessed to the crime. She was asked if, in any of the conversations, she advised the defendant that it would be better for him to tell the truth or that "they might turn you loose." Her answer was in the negative and quite positive. Her recollection seemed to be quite plain upon that point. If she had testified that she had no recollection about it, or recalled the conversation in an indistinct manner, then the matter might have presented a different phase; but it does not appear that her memory was weak or faulty, and it does appear that she had a distinct and clear recollection of what was said. Under such circumstances a witness's memory can not be refreshed. Underhill on Crim. Ev., p. 267; Gillett on Indirect and Collateral Ev., sec. 186; Greenleaf on Ev., 437.

FOX, J.—The defendant in this case, a negro boy, nineteen or twenty years old, was convicted of murder in the first degree by the criminal court of Buchanan county, and from that judgment this appeal is taken.

Statement.

The alleged victim of his crime was his mother, an aged negress, who lived alone in a small cabin in the bluffs of the Missouri river, some miles below the city of St. Joseph. The information charges that he assaulted her and with both his hands about her neck choked her to death.

The Attorney-General with commendable frankness says, in his statement and brief, "In view of the fact that counsel for defendant have made a full and fair statement of this case, we do not deem it prudent to burden the court with the tedium of a more extensive statement." We find the statement of appellant's

counsel full, hence will adopt it, for the purpose of disposing of the errors complained of.

The evidence fairly shows the following facts:

The putrefying body of Elizabeth Coats was found in the cabin above described on Wednesday afternoon, June 25, 1902, by George D. Harmon, a real estate man. Harmon had heard she wanted to buy a house and lot and had made two trips to the cabin previous to the one which resulted in the discovery. The first was on Sunday afternoon about two o'clock. On that trip he got out of his buggy, knocked on the closed door and, meeting with no response, went away. On Tuesday afternoon he went back again, found appearance the same as at the Sunday visit, knocked at the door with the same result, and went away again. On Wednesday afternoon when he returned the third time, he found the screen door closed as before, but the inside door was slightly ajar. He looked through the aperture and saw the old lady lying on the bed. He also saw a jug and a cup sitting by the side of it, and not knowing the habits of the woman, he supposed she was possibly in a drunken stupor. He did not attempt to enter, but went to Mr. Huffman's house, near by, and asked that some one who was acquainted with the old woman go with him. Fred Huffman, a boy, returned with him. Arriving at the house the Huffman boy pushed the door open when a stifling stench met their nostrils. They entered the room and found the dead body of the woman lying diagonally across the bed, with the head near the back side of the foot of the bed, and the feet, nearly to the knees, projecting over the rail. The body lay on the abdomen and chest and partly on the face. The pillow upon which the head lay was saturated with blood or a bloody substance. The bed was in disorder, a jug, and, some of the witnesses say, a chair also, was turned over on the floor. The body was clothed in an underskirt and a dark

Vol 174 mo—26.

colored skirt which was drawn up about the knees. Both shoes were off and lying on the floor and one stocking was entirely off and the other down about the ankle.

Mr. Harmon left some persons in charge and went to Harper & Hyde's store and telephoned the coroner. It was about 5:30 p. m. when he did this. He met the coroner by appointment and took him to the cabin, arriving there about dark.

Dr. J. M. Doyle, the coroner, testified that he in company with a friend, Dr. Humphreyville, went to the cabin in company with Mr. Harmon; that he found the room untidy and in disorder, a jug turned over on the floor, and the bed clothing looked as if there had been a struggle. He made a hasty examination of the body, found a contusion or swelling over the right eye abnormal in size, a bruise on the inside of the lip, the muscles of the neck badly swollen, and the tongue protruding to the teeth, probably a quarter of an inch beyond. Maggots were present, and from all appearances she had been dead three days—possibly longer. He had the body removed to the morgue, and the next day held an autopsy. From the autopsy he concluded she had been choked to death. He found the muscles of the neck discolored, bruised and congested. After the body had lain in the morgue with the pressure removed from the left side of the face, the right side of the face and the right eye subsided and the doctor came to the conclusion that she had not been struck upon the right side of the head. The doctor further testified that he made an examination of the lungs and found some congestion. He also found slight congestion at the base of the brain, but said the congestion of the lungs and at the base of the brain might have been produced by some other cause than choking. He further said that he examined all the vital organs of the body, but that it would be difficult to determine that length of time after death whether

they had been so diseased during life as to produce death.

When the doctor arrived at the cabin in company with Mr. Harmon and Dr. Humphreyville, he found the defendant there, talked to him a while, and started away, when he concluded to arrest him and bring him back with him. Along the road home the doctor questioned him closely as to his whereabouts for some days prior thereto and he told him he had stayed at Wells Frans's on Saturday night and on Sunday he had gone over to the lake with Bud Turner and his wife, etc. The doctor further questioned him about the property his mother owned, his interest now since her death, whether she had any money about her and where she kept it. He replied to the latter questions that she sometimes had $25 or $30, which she kept under her pillow or in a trunk. The defendant complained to the doctors that his stomach had been out of order for the past two or three days. He further said that his mother had some money in the bank and that he would have to go next day and look after it.

The doctor took the defendant to the police station, where he was locked up. That same evening Mr. Mytton, the prosecuting attorney, called at the police station and interviewed the defendant for half an hour or an hour in the presence of two police officers, at which time the defendant denied all knowledge of the crime. He was thoroughly questioned by those present, and Mr. Mytton made the following statement: ''I couldn't say that we plied him with questions to that end. I will candidly say, that he was suspicioned by myself and the rest, and when I left him that night I was absolutely convinced that he had nothing to do with it.''

On the direct examination of Dr. Doyle, the coroner, he was asked if he had a conversation with the defendant at the police station after the autopsy had been held and he stated that he had; that he had under-

stood the defendant had made a confession and he went to the police station to hear it. This testimony was objected to by the defendant on the ground that if a confession had been made the burden was upon the State to prove that it was not the result of inducement or duress. The court sustained the objection. The jury was then excused and the chief of police called, who testified that no threats were made nor promises held out to the defendant to secure the confession; that it was made by the defendant on the second morning following his arrest; that on that morning he (the chief of police) was asked by one of the officers if Mrs. Smith (a negro woman and relative of the defendant) could see defendant and talk to him. Permission being given, about five minutes afterward the officers came back and told him that Coats wanted to make a confession. Thereupon he was brought to the office of the chief, where in the presence of Officer James Frans, Sergeant Gibson, Richard Graves and others the confession was taken. The officers who were present all testified that no threats or promises were made to secure the confession. Lizzie Smith (who is sometimes called Mrs. Homer Smith) was also called by the court and examined as to what inducements, if any, she had offered to the defendant to procure the confession and she testified that she offered none. Thereupon, the court admitted the testimony and Doctor Doyle was recalled and examined as to the oral confession the defendant made to him.

George D. Harmon, the witness who found the body, testified that when he went to Harper & Hyde's store to telephone the coroner, a negro boy who strongly resembled the defendant came and stood at the door and listened to the conversation. Afterwards, and after the confession had been made, Harmon called at the police station and asked the defendant if he was the party who stood at the door of the store and listened to him telephoning the coroner, and the defend-

ant said he was. Harmon telephoned, it will be re-membered, at 5:30 p. m.

Sol McCauley, for whom Coats had worked on the Wednesday the body was found, testified that he and Coats went to town in the afternoon with a load of potatoes and that they started home about five o'clock in the afternoon, and that they did not hear of the finding of the body until a man met them some distance below town and told them of it.

Richard Graves, the secretary of the police board, who was present when the first confession was made in the office of the chief of police, and who reduced the confession to writing, testified, in addition to the fact that no threats or promises were made, that the exam-ination of the defendant lasted an hour and a half or two hours; that questions were asked one after another and answered by Coats, and then the substance, as they understood it, was written down, and that the confes-sion was not in the language of the defendant.

The statement is as follows, to-wit:

"Name? William Coats.

"Age and birthday? Seventeen, the last Sunday in May, 1902.

"Married (if so, to whom, and where wife is)? Not married.

"Single? Yes.

"Where born? One-half mile south of Lake Con-trary.

"Date of arrival in St. Joseph?

"Where boarded (name each place)? Worked for James Hawley, south of the city.

"Who do you know in town, and occupation and address?

"Where were you at (hour when crime com-mitted)? I killed my mother, Elizabeth Coats, about 10:30 o'clock on the night of Saturday, June 21, 1902, by first striking and then choking her. I left the home of Wells Frans, three miles east of my mother's home,

about 7 o'clock in the evening, went direct to mother's, found my mother at home alone, talked to her a while, struck her on the side of the head with my fist, knocked her over on the bed, and then choked her until she was dead. I then went outside and stayed ten minutes. I looked in the house and saw her still lying on the bed, but did not go back in the house. I then went back to the home of Wells Frans. I was not positive, but thought my mother was dead when I left her. When I returned to the home of Wells Frans about 12 o'clock, they were all in bed. I stayed there until the next morning. Then I went up to Alex. Green's the next morning, in company with Bud Turner and his wife, Carrie Turner. There I saw my father, James Coats, who asked me if I 'had done that,' meaning killed my mother. I told him I had, and he said, 'Well, you had better.'

"On Sunday, June 15, 1902, I was at Alex. Green's and saw my father there. At that time he told me that my mother would not live with him any more, and that he did not intend that she should marry any other man, and that I had to kill her. He said if I did not he would beat me nearly to death. He had never spoken to me before about killing my mother. Tom Matthews was with us, but not at the time my father told me to kill my mother. Matthews had gone in the house to get a suit of clothes, to clean them.

"After seeing my father on Sunday, June 22, 1902, I then went back to the home of James Hawley. I said nothing more about the murder until Wednesday evening, as Sol McCauley and I were on our way home from St. Joseph, we met a young man named Lawless near the fish hatchery, who told us he had heard my mother was dead. McCauley and I. drove down to my mother's house. Several people were there. We stayed on the outside until the coroner came. I then went in and saw my mother just as I had left her the

night I murdered her. The coroner then brought me to St. Joseph, and left me at the police station.

his

"WILLIAM (X) COATS."

mark

It will be observed that this confession implicates the father of the defendant, and in it the defendant states as his reason for killing his mother that his father made him do it. Chief Frans testified that after the confession was made implicating the father, he had the old man arrested and locked up; that he talked with the old man and doubted his guilt. He (the chief) then had another talk with the defendant, and the defendant told him his father had nothing to do with it.

A second confession was made, which is as follows, viz.:

"Q. What is your name? A. William Coats.

"Q. How old are you? A. I couldn't say.

"Q. William, what was your mother's name? A. Her name was Elizabeth Coats.

"Q. Did you kill your mother? A. Yes, sir.

"Q. When did you kill your mother? A. Saturday night.

"Q. June 21, 1902? A. Yes, sir.

"Q. Where did you eat supper that night? A. Wells Frans's.

"Q. What time did you eat your supper? A. Pretty near six o'clock.

"Q. After you had eaten your supper where did you go? A. I went outside and sat on a stump.

"Q. About how long did you stay outside? A. Quite a little bit.

"Q. When did you first think, William, about killing your mother? A. When I was sitting out on the stump.

"Q. How far is it from Wells Frans's to where your mother lives? A. About three miles, as near as I can tell you.

"Q.    When did you conclude to kill your mother?
A.    As I was sitting on the stump.

"Q.    Where did you go next?    A.    I went from the stump, around the stable, then over the hill.

"Q.    About how fast did you travel?    A.    Just mosied along.

"Q.    About what time of the night was it when you got to your mother's?    A.    About ten o'clock as near as I can tell.

"Q.    Did you rap on the door?    A.    Yes, sir.

"Q.    Did your mother answer?    A.    She asked what I wanted.

"Q.    Did you go into the house?    A.    Yes, sir.

"Q.    Where was your mother sitting?    A.    On the side of the bed.

"Q.    How was she dressed?    A.    She had on a golf skirt, one stocking and a black skirt.

"Q.    Was she ready for bed?    A.    Yes, sir, I think she was.

"Q.    Was there a light in the house?    A.    Yes, sir.

"Q.    What kind of a light was it?    A.    A big coal oil light.

"Q.    Where was it sitting?    A.    On top of the safe, and the safe was on top of a dry goods box.

"Q.    How long were you in the house until you concluded to kill your mother?    A.    Quite a little bit.

"Q.    Do you know how long?    A.    No, sir.

"Q.    What did you and your mother talk about? A.    She asked me where I had been and what I was doing, and I asked her what she had been doing.

"Q.    Where did you first strike your mother?    A. In the side of the head.

"Q.    What with?    A.    With my fist.

"Q.    On the right-hand side?    A.    Yes, sir.

"Q.    Which fist did you use?    A.    Right hand.

"Q.    When you struck your mother did she say

anything to you? A. When she fell she mumbled something but I did not understand what it was.

"Q. Where did she fall? A. Across the bed.

"Q. What did you then do? A. I choked her a while.

"Q. How many hands did you use to choke her? A. One.

"Q. Which hand? A. Right hand.

"Q. What did you do with the left hand? A. Held her.

"Q. Where did you hold her? A. Along on the chest.

"Q. Did she cry? A. No, sir.

"Q. Did she holler? A. No, sir. Not a holler.

"Q. How long did it take you to choke her? A. I can not say.

"Q. About how many minutes did you hold her while you were choking her with your right hand? A. I couldn't say, telling the truth.

"Q. What did you then do? A. After I choked her I went outside and stayed there about ten minutes.

"Q. Did you turn the light out? A. No, sir.

"Q. When you went outside and stayed about ten minutes what did you do? A. I stood out at the east side of the door.

"Q. Did you listen for any noise? A. Yes, sir, when I first went outside I was frightened, afraid to go and afraid to stay.

"Q. Why were you frightened? A. Because I had killed my mother.

"Q. Did anyone help you to kill your mother? A. No, sir, no one at all.

"Q. Did any one tell you to kill your mother? A. No, sir.

"Q. Did you kill your mother by yourself? A. Yes, sir, all alone.

"Q. Why did you kill her? A. I couldn't tell you why.

"Q.   Had she ever ill-treated you? A.   No, sir.

"Q.   William, how many weeks was it before this night that you had seen your mother? A.   Two weeks and three days.

"Q.   Did you look into the house when you were outside this ten minutes? A.   When I left I peeked through the screen door.

"Q.   Could you see inside? A.   Yes, sir.

"Q.   Where did you see your mother? A.   She was lying on the bed.

"Q.   Did she utter any sound or make any noise? A.   No, sir, none at all.

"Q.   You left her there for dead? A.   Yes, sir, I thought so.

"Q.   Where did you go after you had killed your mother? A.   Went back to Wells Frans's.

"Q.   What time did you get home? A.   About 12 o'clock as near as I can say.

"Q.   What time was it when you got in bed? A.   Couldn't say.

"Q.   How long did it take to undress? A.   Just a little while.

"Q.   Did you speak to anyone? A.   Told George Bradley and Louis Frans to lay over.

"Q.   Three in a bed? A.   Yes, sir.

"Q.   Did you at any time that you had seen your mother before this night have any dispute with her about buggies or wagons? A.   Yes, sir, about the spring wagon wheel.

"Q.   What was it? A.   On the day that I last saw my mother before this night that I killed her I took one of the wheels off a light spring wagon and put it on the cart.

"Q.   Then what did you do? A.   I then went to James's store to get some Granger tobacco.

"Q.   When you came back what did your mother say? A.   When I came back my mother told me never to take another wheel off of her wagon for nothing.

State v. Coats.

"Q. Did you have any words about it? A. I told her that I would not and that I didn't think there was any harm done in using it then and that it was muddy or I wouldn't have used it then.

"Q. When you got in bed after you had killed your mother did you sleep all night long? A. I slept pretty well. Of course I would wake every once in a while.

"Q. When you woke up did you think of what you had done? A. One or two times when I woke up.

"Q. What did you think? A. Why, I just commenced thinking what would be done with me.

"Q. What did you think would be done with you? A. Thought I would be hung or murdered.

"Q. William, have you tried to tell the truth, the whole truth and nothing but the truth in this statement that you have made? A. Yes, sir.

"This is my free and voluntary statement, and made of my own free will.

"WILL COATS."

This confession was taken on Monday afternoon following the discovery on Wednesday and the previous confession on Friday. It was taken in shorthand in the presence of the chief of police and the prosecuting attorney, by Miss Fleming, and by her transcribed on the typewriter and later signed by the defendant. The prosecuting attorney and the chief of police both testified that no threats or promises were made to secure this confession, but it nowhere appears that, as to any of these confessions, the defendant was cautioned or warned that any statement made by him would be used against him. This confession differs from the first confession mainly in that it exonerates the father of the defendant and introduces the wagon-wheel incident about which the defendant says he and his mother had a little quarrel some weeks before.

James Curtin and John Thomas, deputy sheriffs, testified that when the prisoner was removed from the police station to the county jail, he told them he killed his mother for money; that she had thirty-five or forty dollars about the place that he wanted.

Fred Huffman, the neighbor boy called in by Harmon, testified that when the defendant came into the room the afternoon the body was found he took a valise off a trunk that sat on the west side of the room, then he reached in his pocket as if looking for a key, and walked around the room and when asked what he was looking for, said he was looking for a black skirt in which she kept her money; that Fred Cobb stopped him from disturbing things till the coroner came.

All the State's witnesses have not been referred to in the foregoing statement, but those who have not been mentioned have merely corroborated the testimony given by those named.

The defendant proved by Louis Frans and Arthur Gulliver that on Friday and Saturday nights (Saturday night being the night the defendant says he killed his mother) the defendant was at the home of Wells Frans and stayed all night both nights and slept with them—the three in one bed; that he came to Wells Frans's about seven or eight o'clock in the evening on Friday. These witnesses are fully corroborated by Wells Frans, Mrs. Wells Frans, James Turner, sometimes called Bud Turner, and Carrie Turner, wife of James Turner. These witnesses all say that Coats came to Wells Frans's house on Friday evening before they heard that the body of Elizabeth Coats had been found on Thursday evening following; that he remained there all night Friday night, and Saturday morning left there to go to the lake; that he went to the lake is shown by Thomas Matthews, who says he saw Coats there on Saturday; that they went fishing for a while, and in the afternoon Coats went off down the lake (toward Frans's). They also say, that he

was there at Wells Frans's on Saturday night and remained all night; that on Sunday morning, he, in company with James Turner and his wife, went again to the lake, where they remained until in the afternoon, when they started home, Coats going with them until they reached the road which led east to Jim Hawley's; that Coats left them (James and Carrie Turner) there, saying that he was going to Jim Hawley's, where he was to work the next day.

James Hawley, a white man, testified that the defendant commenced working for him about the 10th or 12th of May preceding his arrest, and that he was still working for him at the time he heard of his mother's death; that on Friday prior to the arrest the defendant came to town with him on a load of hay; that he came home, got his supper and went away, leaving about seven o'clock. He further said that about eight o'clock on Sunday evening when he got home from the lake he found the defendant there; that he ate his supper, sat around and smoked a while and went to bed. The next morning about half past five, when he got to the barn, Coats was up feeding and doing the work.

It was shown by Nathan Frans, a brother of the deceased, that their father had died of consumption; that the deceased had excellent health until seven or eight years ago, since which time she had been ill more or less of the time; that she coughed, complained that cold had settled on her lungs, and that her lungs hurt her a good deal.

It was shown by Mrs. Huffman that the deceased's health had not been good during the winter and spring previous to her decease; that she had been in bed on and off; that late in the spring she had la grippe.

Mr. Neville testified that about two or three weeks prior to her death, he was passing the cabin and saw her sitting on the bed, or partially lying down, with a white rag or bandage tied over her head; that he asked

her if she was sick, and she said she had not been well for a couple of weeks; that he was at the cabin when the body was discovered, and did not see any chair turned over, but that he did see a chair sitting on the north side of the room, and between the door and the bed, on which was sitting a cup with some lightbread and coffee grounds, and a rag by the side of the cup that he took to be a poultice.

Mrs. Homer Smith was recalled by defendant for further cross-examination. (She had been previously called by the court, in the absence of the jury, to show that the confession had not been obtained by improper means.) At this time the defendant undertook to cross-examine the witness relative to her testimony before the coroner's jury, and to refresh her memory by reading from her testimony at the inquest. The court refused to permit this, and the defendant excepted on the ground that she was the State's witness, and he had a right to cross-examine, impeach or refresh her memory.

The defendant put upon the stand a number of physicians who qualified as experts, and propounded to them a hypothetical question. This question recited the evidence which tended to establish the alibi, and other facts inconsistent with the defendant's guilt, and which contradicted the various confessions, and assumed that the defendant did not in fact do the things which he confessed he had done, and concluded by asking an opinion as to the condition of the defendant's mind at the time he made the confession. All the physicians called by the defendant and most of those called in rebuttal by the State, answered that, assuming the facts stated in the question to be true, the defendant was insane at the time he made the confession. A number of physicians called by the defendant also testified that from a physical and mental examination of the defendant, they found him to be of a low order of intellect bordering upon idiocy. This testimony was

offered by the defendant for the purpose of accounting for the confession.

In rebuttal of this evidence the State offered a number of physicians who qualified as experts, and propounded to them, over the objection of the defendant, a hypothetical question, which assumed the truth of the statements contained in the confession and called for an opinion as to the condition of the defendant's mind at the time he committed the deed. A number of physicians also testified on behalf of the State from a physical and mental examination of the defendant shortly after his arrest. They found him possessed of the ordinary intelligence of his class, and able to distinguish right from wrong.

The State also offered a number of witnesses (non-experts) who testified that they had known the defendant for a number of years, and that they never saw anything wrong with him mentally.

This constitutes, substantially, the testimony upon which this case was submitted to the jury. It is a sufficient reference to the testimony to intelligently discuss the errors complained of, in respect to the admission and exclusion of evidence by the trial court during the progress of the trial.

This cause was submitted to the jury upon instructions of the court, and they returned a verdict of guilty of murder in the first degree.

In due time and form, appellant filed his motion for new trial, which was by the court overruled. Defendant was sentenced in accordance with the verdict, and this cause is now presented to this court, upon appeal, for review.

There are but few errors in a case of this magnitude urged; however, they are ably and earnestly presented by counsel for appellant, in their brief.

We will first direct our attention to the errors complained of, in respect to the instructions.

State v. Coats.

Opinion.

It is insisted by appellant that instruction number 3, given by the court, in the trial of this case, is erroneous for the reason that it is a comment on the evidence. The instruction is as follows:

"The court instructs the jury that if they believe and find from the evidence that the defendant made any statements in relation to the homicide charged by this information, after such homicide was committed, the jury must consider such statement or statements all together. The defendant is entitled to the benefit of what he said for himself, if true, and the State is entitled to the benefit of anything he said against himself, in any statement or statements proved by the State. What the defendant said against himself the law presumes to be true, because said against himself. What the defendant said for himself the jury are not bound to believe, because it was said in a statement or statements proved by the State, but the jury may believe or disbelieve it, as it is shown to be true or false by the evidence in this case. It is for the jury to consider, under all the circumstances, how much of the whole statement or statements of the defendant, proved by the State, the jury from the evidence in this case deem worthy of belief. And if the jury believe from the evidence that the defendant at the times he made the confessions or statements introduced in evidence, was insane, then they should disregard such confessions or statements."

It is sufficient to say as to this instruction, that it has been approved by a uniform and unbroken line of decisions of this court. [State v. Talbott, 73 Mo. 347; State v. Hollenscheit, 61 Mo. 302, and numerous other cases.]

Complaint is also urged against instruction number 4, which is as follows: "The jury can not find that the deceased came to her death by violence on the confession of the defendant alone; and, unless you be-

lieve that fact has been corroborated by other evidence in the case, you must find the defendant not guilty.''

We will simply say as to this instruction, that while it may not be sufficiently clear and full as a guide to the jury, on that subject, it is not open to all the criticisms indicated in the contention of the appellant.

A careful examination of the cases cited by appellant, will demonstrate that the rule is not so far-reaching as suggested by his learned counsel: It is not required, to warrant a conviction, that the body of the crime must be absolutely proven, independent of the confession; those cases approvingly speak of corroborating circumstances. While the confession alone, without any corroborating circumstances or proof *aliunde* as to the *corpus delicti,* would not be sufficient, yet, if with the extrajudicial confession, such other facts and circumstances are introduced in evidence fully corroborating the confession of the defendant as to that particular subject, it is ample upon which to base a conviction. Such was the clear announcement of the rule in case of State v. Lamb, 28 Mo. 218. Judge SCOTT in that case says: ''We consider the true rule, as deduced from the current of authorities, to be that an extrajudicial confession, with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction.''

It will be observed in that case, that in reaching a conclusion as to the actual commission of the offense, you take into consideration the confession, as well as the extrinsic circumstances corroborating it. As this case will be reversed and remanded on another ground, the objectionable features of the instruction under discussion can be remedied in accordance with the suggestions herein indicated.

Instructions numbered 6 and 7 complained of in this cause, are as follows:

Vol 174 mo—27.

"6. In this case insanity is interposed as an excuse for the charge in the information. This defense is recognized by the law; and, should insanity be proven by the evidence in this case to your reasonable satisfaction, it will be your duty to acquit. Insanity is a physical disease located in the brain, which disease so perverts and deranges one or more of the mental faculties as to render the person suffering from this affliction incapable of distinguishing right from wrong, in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the law of God and of society. The law presumes every person, who has reached the years of discretion, to be of sound mind; and this presumption continues until the contrary be shown; so, in this case, where insanity is pleaded as a defense to a criminal charge, the fact of the existence of such insanity at the time of the commission of the act complained of must, before you can acquit him upon that ground, be established by the evidence to your reasonable satisfaction; and the burden of proving this fact rests on the defendant.

"7. The law does not excuse unless the insanity is of such a character that it actually renders the person incapable of distinguishing between right and wrong in respect to the particular act charged, at the time of its commission. But to establish insanity as a defense, positive or direct testimony is not required, nor is it necessary to establish this defense beyond a reasonable doubt; it is sufficient if the jury are reasonably satisfied by the weight or preponderance of the testimony that the accused was, at the time he committed the act, if he did commit it, incapable of distinguishing between right and wrong. Wherefore, the court instructs the jury that if they believe from the evidence that, at the time the defendant did the killing (if you find that he did the killing) charged in the information, the defendant was so perverted and de-

ranged in one or more of his mental or moral faculties, as to be incapable of understanding, at the time he killed Elizabeth Coats (if you find that he did kill her), that such killing was wrong and that he, the defendant, at the time, was incapable of understanding that this act of killing was a violation of the laws of God and society, if the jury find that he was so insane, they should find him not guilty. The law does not excuse unless the derangement is so great that it actually renders the person incapable, at the time of its commission, of distinguishing between right and wrong in respect to the particular act charged and proved against him. Whether the hypothetical case, upon which the opinions of the experts are based, corresponds to and coincides with the case of the defendant, the jury alone must determine in the light of the testimony presented on this trial. And whenever it supposes facts not given in evidence, it should be disregarded by the jury.''

This instruction seems to be in due form and in perfect accord with approved precedents; but the propriety of applying it in this case must depend upon the question as to whether there was any competent testimony upon which to base it. An examination of the record in this cause fails to disclose any evidence on the part of the defendant, upon the question of insanity, except that which relates to his mental condition after the alleged commission of the offense, and at the time he made the confessions offered in proof. The defense in this case interposed, was not that of insanity, but an alibi. And counsel for appellant proceeded upon the theory that defendant was not present at the time it is alleged the offense was committed, and as emphasizing this theory introduced the evidence as to his mental condition at the time of making the confessions. The mere fact of defendant's mental condition being of a low order, would not warrant an instruction on insanity. If the court felt that the testi-

mony offered by defendant of his insanity at the time he made the confession would mislead or confuse the jury, it would have been authorized and in perfect accord with the testimony to have told the jury, by an appropriate instruction, that there was no evidence of insanity at the time of the commission of the offense and limited the consideration of insanity to the time of the confession. Defendant's counsel had the right to go before the jury with the issues as made by the evidence. From the evidence in this case, the issues were sharp and pointed as to the presence of the defendant at the commission of the offense charged, and as to the truth or falsity of the confession made. We have reached the conclusion that this instruction injected a false issue into the trial of this case, as made by the evidence, and was calculated to operate injuriously upon the defense interposed. This was error, and it is not cured by reason of the fact that the court, in instruction number 7, required the jury to find that defendant killed deceased. Instruction number 6 had announced to the jury that the defendant had interposed the plea of insanity as an excuse for the charge against him in the information. We think it clear that this instruction, which presented an issue not applicable to the evidence, was calculated to seriously detract from whatever force or effect there might have been in the real defense made.

This brings us to the only remaining contention as to the efforts of defendant to elicit the testimony of Mrs. Homer Smith before the jury, and the question as urged for new trial on the ground of newly-discovered evidence. These two complaints of error refer to the testimony of Lizzie (Mrs. Homer Smith), hence will be treated of jointly.

The error in respect to these contentions, which mostly attracts our attention, is the refusal of the court to permit counsel to fully examine the witness, Mrs.

Smith, upon being recalled by defendant. The record discloses that this witness testified at the coroner's inquest, and that her testimony when called by the court, in the preliminary hearing as to the admissibility of the confession, was not strictly in accord with her testimony before the coroner, or at least it was not as full as to the conversations had with the defendant prior to his confession. After the court had passed upon the admissibility of the confession of the defendant, and during the progress of the trial before the jury, appellant recalled this witness. The court permitted counsel for appellant to examine the witness as to the conversations with defendant before the confession was made, and it appears from such examination that counsel fully exhausted her memory, and the court all through the examination refused to permit any cross-examination of the witness; as stated by the court, it was "improper to impeach your own witness." After all this effort to elicit from this witness the facts as she had stated them before the coroner, and after having apparently exhausted the memory of the witness, counsel proceeded to try to refresh the memory of the witness. That we may fully comprehend the import of this examination, we here quote what was said and done, from the record in this case:

"Q. To refresh your memory, I want to ask you if Dr. Doyle asked you this question: 'What did you say?'—

"Mr. Mytton: Your honor, I object.

"The Court: I don't think this is proper. That can only be proper for the purpose of impeachment.

"Mr. Nichols: If the court please, I have tried to avoid infringing upon any rule, and this is the only liberty I want to ask of the court at this time, and I ask this liberty for the purpose only of refreshing her memory. I don't think there could be any objection to that, and I have the papers that Mr. Mytton gave

us a minute ago, and I simply want to read from that to refresh her memory. If she says she didn't say it, we will not go into any evidence to impeach her.

"The Court: I don't see any object in calling her attention to a matter of that kind, and reading from a paper that purports to be her statement, except for the purposes of impeachment.

"Mr. Nichols: This is not for the purpose of impeaching at all.

"The Court: Well, that can only be the proper effect of reading from a paper that purports to be her statement. The objection will be sustained. To which ruling of the court the defendant at the time objected and excepted and still excepts, on the ground that this is a hostile witness to the defendant, that she was placed on the stand once by the judge and once by the defendant, and we have a right to cross-examine, to impeach her or refresh her memory.

"Mr. Nichols: It is for the purpose of refreshing her mind as to other things.

"The Court: Well, ask your questions.

"Mr. Nichols: I will ask the question in this form: At that examination, in answer to a question by Dr. Doyle, did you, in addition to what you have already said, say, 'Will, did you do that?' and he says, 'No, ma'am;' I says, 'Now, Will, you tell the truth; if you did that, tell the truth,' and I think I says, 'If you do it, they will turn you loose.'

"Mr. Mytton: Well, we object to that.

"The Court: The objection is sustained. To which ruling of the court the defendant at the time excepted and still excepts upon the grounds that she was called and placed on the stand by the judge and by the defendant and was a hostile witness to defendant and we have a right to contradict her, impeach her or refresh her memory.

"Mr. Nichols: If the court please, I don't believe that I ever knew of a party in a case being de-

prived of the privilege of refreshing the memory of a witness where it was done in a legitimate way—

"The Court: You asked her whether or not there was anything said 'that he would be turned loose,' and she said. no. Now, undoubtedly, the effect of it is to, impeach what she says now. You have suggested to her, in her statement before, so as to refresh her memory as to whether or not anything of that kind was said, and she said there was not; and now you want to read her testimony to her and ask her if she didn't state *that*. The effect of that would be to impeach her. I don't think it is proper.

"Mr. Nichols: Well, the defendant excepts, of course."

It will be observed, that the testimony sought by this examination, was as to conversation had with defendant, prior to his confession, tending to show inducements for making the confession. This conversation, so the record discloses, was in the presence of a police officer, who afterwards testifies as to the confession.

The court had the right to determine the admissibility of the confession, as to the truth of it, and the weight to be attached to it was a question for the jury, and they had the right to know all the circumstances under which the confession was made. To appreciate the importance of this testimony, it is very appropriate to quote the views of that able jurist, Judge Scott, in the case of State v. Lamb, supra. He says: "The jury are not only entitled, but bound, to take into account all the circumstances under which a confession is made, and to give little weight to it, or throw it out of view altogether, according as these circumstances appear to incline less or more against the admission."

This testimony was not only competent, but also very important, in determining the truth of and the weight to be attached to the confession, and it was

error for the court to refuse to permit counsel to elicit it in the manner as indicated by the record. It is immaterial whether Mrs. Smith is to be denominated the State's, defendant's or court's witness; the witness was on the stand for the purpose of disclosing whatever she knew relevant to this case, and the court should have permitted such examination of her as would elicit the truth. While due regard should be had for the well-recognized rules controlling the examination of witnesses, yet such rules should not be construed and enforced with such technical' nicety as to defeat the purposes of an examination—the ascertainment of the truth.

The error in respect to Mrs. Smith's testimony consisted in the refusal of the court to permit such examination as would have disclosed the evidence, rather than in the overruling the motion for new trial on the ground of newly-discovered evidence. The evidence of Mrs. Smith before the coroner was discovered before the trial closed, and the discovery, properly speaking, was not as to the evidence, but was the discovery that the witness would contradict herself, and the further ascertainment of the fact that she was willing to correct her contradiction. The affidavit of Mrs. Smith only emphasizes the error in the refusal to permit her thorough examination, and refusal to allow her memory to be refreshed. There was no error in the refusal to set aside the verdict upon the newly-discovered evidence.

It is unnecessary to discuss the complaint of the admission of the testimony of the expert and non-expert witnesses as to the sanity of defendant at the time of the alleged commission of the offense. What is said as to the issues in giving the instruction on insanity, is equally applicable to the admission of this testimony. The defendant did not, by any testimony introduced, present the issue of insanity as an excuse for the commission of the offense; hence, it was error

to admit, in rebuttal, testimony which had nothing to operate upon or rebut. This testimony should have been limited to the time of the confession; extending it to the time of the commission of the offense was error, and as to the defendant's mental condition at that time, should have been excluded.

For the errors that have been indicated, the judgment will be reversed and cause remanded for a new trial in accordance with the views herein expressed. All concur.