## THE STATE v. GLAHN, *Appellant.*

1. **Criminal Law.:** EVIDENCE TO SUPPORT VERDICT : PRACTICE IN APPELLATE COURT. The supreme court will not reverse a judgment upon the ground that the verdict is unsupported by the evidence, unless there is either a total failure of evidence, or it is so weak that the necessary inference is that the verdict was the result of passion, prejudice or partiality.

2. ———: EVIDENCE : THREATS. Expressions of ill-will and threats, on the part of the defendant toward the deceased, are competent on a trial for murder, and the nearness or remoteness of the threats to the date of the homicide does not affect their competency as evidence.

3. ——— : MURDER : THREATS. Proof of the fact that a homicide has been committed, and that the defendant on trial for the crime has made previous threats against the deceased, is not sufficient to warrant a conviction of murder ; there must be some other evidence connecting defendant with the crime, and it is error, in such case, to refuse an instruction to that effect.

4. ——— : ——— : STATEMENTS OF DEFENDANT : INSTRUCTION. On a trial for murder, where the evidence against the defendant is circumstantial, it is proper to give the jury a cautionary instruction, directing them to consider the evidence of verbal statements and admissions of the defendant with care and caution ; but a request to instruct the jury that " evidence of casual statements or admissions by a party made in casual conversation, and to disinterested persons, are regarded by law as the weakest kind of evidence that can be produced, owing to the liability of the witnesses to misunderstand or forget what was really said or intended by the party," should be refused.

5. ——— : ——— : PRACTICE. Where the evidence shows a defendant guilty of murder in the first degree, or of no crime at all, and he is convicted of that offense, the giving of an instruction for murder in the second degree will not produce a reversal.

6. ——— : ——— : EVIDENCE. The statement of a person, in the presence of the defendant, that he thought the man who committed the murder could be found in the field, is not admissible, not being such a statement as called for action or reply from the defendant, nor such as would construe his silence into an admission of guilt.

7. ——— : ——— : ———. On a second trial for murder, evidence of what the defendant testified to on the first trial is admissible.

*Appeal from Monroe Circuit Court.*—HON. T. H. BACON, Judge.

REVERSED AND REMANDED.

*Blair & Marchand* for appellant.

(1) The demurrer to the evidence should have been sustained. (2.) The seventh instruction asked by defendant should have been given. Declarations of intention, threats, expressions of ill-will, attempts, menaces, expressions of vindictive feelings, quarrels, previous difficulties, other crimes ( when allowable ) and domestic troubles may be proven to show motive, willfulness, deliberation, premeditation and malice, and to disprove self-defense in certain cases ; but amount to nothing unless defendant be connected with the murder by proof of physical facts. Whart. Cr. Law ( 3 Ed. ) pp. 340, 341 ; Whart. Cr. Ev. ( 9 Ed. ) secs. 48, 756, 785-86; Burrill Cir. Ev. ( 1868 ) ; *State v. Watkins,* 9 Conn. 47 ; *Johnson v. State,* 17 Ala. 618 ; Roscoe's Cr. Ev. 96, 740 ; 2 Phil. Ev. 498 ; *State v. Rash,* 12 Ire. 382-84 ; *State v. Green,* 1 Houst. Crim. C. ( Del. ) 217-27 ; *State v. Barfield,* 7 Ire. ( N. C. ) 303 ; *State v. Hyner,* 15 Nev. 49, 54, 55 ; *People v. Kern,* 61 Cal. 244 ; *People v. Hendrickson,* 1 Parker, 406 ; *State v. Green,* 35 Conn. 203, 205 ; *State v. Hoyt,* 47 Conn. 518-39 ; *Goodwin v. State,* 96 Ind. 550 ; *Jefferds v. People,* 5 Parker, 522 ; *Marler v. State,* 67 Ala. 55 ;, *People v. Dennis,* 39 Cal. 625-35 ; *Pound v. State,* 43 Geo. 88 ; *LeBeau v. People,* 34 N. Y. 223 ; *Mumies v. State,* 16 Oh. St. 221 ; *Hopkins v. Com.,* 50 Pa. St. 9 ; *Koerner v. State,* 98 Ind. 7 ; *State v. Cole,* 63 Io. 695 ; *Boyle v. State,* 61 Wis. 440 ; *Garrett v. State,* 76 Ala. 18 ; *McMeen v. Com.,* 114 Pa. St. 300 ; *State v. Lawler,* 28 Minn. 216 ; *Marler v. State,* 67 Ala. 55 ; *Coxwell v. State,* 66 Ga. 309 ; *State v. Edwards,* 34 La. Ann. 1012 ; *State v. Birdwell,* 36 La.

Ann. 859 ; *Biggs v. State*, 30 Miss. 635-48; *Jones v. State*, 57 Miss. 684 ; *State v. Nugent*, 71 Mo. 136 ; *State v. Holmes*, 54 Mo. 153 ; *State v. Adams*, 76 Mo. 355. ( 3 )   Instructions numbered 8 and 18 asked by defendant in regard to imperfections, weakness, weight, etc., of threats, declarations of intentions, etc., should have been given. 1 Greenl. Ev. sec. 45, 200 ; Whart. Cr. Ev. ( 9 Ed. ) sec. 756 ; *Cornet v. Bertelsman*, 61 Mo. 118 ; *Ringo v. Richardson*, 53 Mo. 385 ; *Haven v. Cole*, 30 N. W. Rep. 720 ; *Dreher v. Fichburg*, 22 Wis. 675 ; *Husbrook v. Strawser*, 14 Wis. 403. ( 4 )   The instruction as to murder in the second degree was not warranted by the evidence and should not have been given. ( 5. )   The question to witness Wheeler was clearly leading and suggestive, and the court should have sustained objection of defendant thereto.   Defendant's silence was not of such a nature as to lead to the "inference of assent."   When accused of nothing he could not "assent."   Wh. Cr. Ev. ( 9 Ed. ) sec. 679 ; Burrill on Cir. Ev. ( 1868 ) 482.   ( 6 )   The objection to witness Hardy stating what defendant testified to on a former trial should have been sustained.

*B. G. Boone*, Attorney General, and *R. P. Giles*, Prosecuting Attorney, for the State.

( 1 )   It is only where there is a total absence of evidence or it fails so completely to support the verdict, that the necessary inference is that the jury has acted from prejudice or partiality, that the court will reverse a judgment in a criminal case, on the ground that the verdict is against the evidence. *State v. Cook*, 58 Mo. 548 ; *State v. Musick*, 71 Mo. 401 ; *State v. Zorn*, 71 Mo. 415. ( 2 )   The instructions given by the court correctly declare the law.   It was not error to give an instruction for murder in the second degree. *State v. Talbott*, 73 Mo. 347.   ( 3 )   The court properly admitted testimony of the witness Lon Wheeler, in regard to

expression of ill-will by defendant against deceased, also actions of defendant tending to show guilt. Remarks made by third parties in the presence and hearing of defendant as to his guilt of the crime, may, if acquiesced in by him, be shown in evidence. *People v. Ah Yute*, 53 Cal. 613 ; 54 Cal. 89 ; *Com. v. Bradley*, 134 Mass. 530 ; *Com. v. Galavan*, 9 Allen, 271. "Silence is tantamount to confession, whether it may happen or not to have been received into any collection of proverbs, it is repeated and acted upon, with no less safety than the most familiar of the sayings which have been thus distinguished." 3 Benth. Jud. Evid. 86.

BLACK, J.—On the sixteenth of October, 1886, the defendant and his brother were indicted in the Shelby circuit court for murder. The charge is, that with pistols they shot and killed Joseph Hunolt on the fourth of June, 1886. The state dismissed as to Christian P. Glahn, and the venue was changed to Monroe county. After one mistrial, and at the October term, 1887, the defendant was convicted of murder in the first degree.

The evidence is entirely circumstantial, and defendant's counsel earnestly contended that it does not support the verdict. This objection necessitates a somewhat extended statement of the evidence. The deceased was a judge of the county court, traded largely in stock, and often carried larger sums of money on his person than is usual for farmers to carry. The defendant was a farmer and resided in the same neighborhood. About one o'clock in the afternoon of the fourth of June, 1886, the deceased left his home on section eleven and went east to the east line of that section to a public road, thence north two miles, and thence east one mile to the town of Leonard. His home-place could be reached by what is called the east road, which runs south two miles from Leonard, and thence west one mile by a lane. Defendant's land is within this territory of one by two miles. About the same time of day the defendant left his home

and went in a northeast direction across his farm and thence by the public roads to the same place. Both were on horseback. At Leonard they and other persons met and talked about matters in general, as is usual on such occasions. No unfriendly feeling was manifested by either to the other while at Leonard. About five o'clock the defendant left for home, taking some small purchases, and returned by the same route that he went. Shortly thereafter the deceased left for home, but went by the east road, with a view of going to or passing by section one which he owned and in which he kept his cattle. This section one is south of the south part of defendant's farm and is separated therefrom by the lane before mentioned. Deceased went south from Leonard for one mile to the cross-roads, where he was last seen alive. The evidence tends to show that from there he went south another mile and thence west along the north side of section one along the lane. On the next day between nine and ten o'clock his body was found in section one in the brush and timber at a point on a branch which is some 238 yards south of the lane. His horse was hitched to a bush which stood much nearer the lane. To the north and east of this bush there were indications in a patch of grass that the body had been dragged over it in a northeast direction, and at one place on this drag, as it is called, there were found foot-tracks, one set appearing to have been made with a coarse, and the other with a fine boot.

The *post-mortem* examination disclosed five wounds from two shots; one shot entered the right side near the navel and extended upwards through the left lung, and the bleeding was internal. When found there was a gash in the throat extending from ear to ear, but with little or no blood on the deceased's clothes or on the ground at the place where the body was found. The inference is drawn that deceased had been carried from the drag to the place where found, and that his throat was cut at the latter place subsequent to his death.

For the state, a Mr. Robirds testified that he heard shooting and hallooing in the direction of section one at about six o'clock in the evening. He was then at work at a place not far from the defendant's house. He had been working for the defendant up to ten o'clock in the forenoon of that day. He says when he heard the shooting and hallooing he went to defendant's house and made inquiry about it of Mrs. Glahn, and then inquired for Mr. Glahn and she said he was about the farm, perhaps at the granary. Robirds passed by the granary on his road to Mr. Gay's house, where he boarded, but did not see the defendant. That evening the defendant went to Mr. Gay's and the witness gives the following account of what was said: "He came over there about dark. I asked him about the shooting, if he had heard it. He said yes, and turned to Mr. Gay and addressing him asked if he knew where there was a big elm tree down in my pasture. Mr. Gay told him he did. He said he was standing there watching a squirrel-hole in that tree; that he wanted to kill some squirrels. He said, 'I was sitting there at the time and heard the shooting, and it seemed like it was to his back, to the southwest.' He said he heard three or five shots. I do not know whether he gave any definite number or not. I think he heard the hallooing; said he wanted to see if I could cultivate for him the next day in the afternoon. I told him I could. He left it unsettled; he would see me next morning, is my recollection about it. He said he was going from there to Mr. Gartrell's."

This evidence is corroborated by Gay and others. From there, the defendant went to Gartrell's. Mrs. Gartrell testified that her husband was not at home, and the defendant asked her to tell him to bring some money over to his (defendant's) house early the next morning, as his wife was going to Shelbina, and he needed the money. It appears that Mr. Gartrell owed him $2.50; but Gartrell says he had before told the defendant

that he could not pay it until the following Monday. Mrs. Glahn says her husband came in with his gun in a few moments after Robirds left; that he milked the cows, ate his supper, went to Gay's, came back and went to bed and did not leave the house again that night.

Gus. Glahn, a brother of the defendant, lived in Shelbina, but owned a farm in the same neighborhood, and upon which one Gosney resided. Gosney says that defendant came to his house about sun-up on the morning of the fifth of June, and inquired for Gus., saying that he wanted to send a pig to Shelbina to be sent to his mother. Gus. Glahn had been at his farm, but left on the fourth without leaving word where he could be found. From there the defendant went to Ben Glahn's, another brother, and made like inquiries. Gus. Glahn was not there and the defendant took breakfast with his brother Ben. While there he said he had been to Gosney's and that his wife wanted to go to Shelbina with Gus. The defendant then went back to his house, and between nine and ten o'clock he had a conversation with some three different persons on the road in front of his house, in which they spoke of the fact that Hunolt was missing. He then had his gun and professed to be hunting squirrels. To these persons he related the circumstance that he was watching the squirrel trees on the previous evening when he heard the shots towards section one. To some of them he stated that when he came home from Leonard, he put his dog in the granary before he went for the squirrels, because the dog frightened them. These squirrel trees were three-quarters of a mile north of the place where Hunolt was found. The state put in other statements of the defendant of a like character, and also the evidence of two or three persons who testify that they heard defendant say, at the coroner's inquest, on the fifth, that he was ploughing corn when he heard the shots.

The theory of the state is that defendant came from

Leonard, put away his horse, shut the dog up in the granary, and then went down to section one and there shot Hunolt, and that these statements were made to screen himself from detection. It may be stated here that it is clearly shown that these trees did have holes in them, such as squirrels frequent; there is no certain evidence that defendant was not at these squirrel trees.

The defendant had been sick and under the care of a physician some days previous to the fourth; but on that day and on the fifth he was able to do chores about his farm, but attempted no continued hard work. The witness Robirds also states that Glahn's wife had previously intended to go to Shelbina on the fifth. The defendant had a corn-field of some eight acres southeast of his house, and on Sunday evening of the sixth of June, some persons discovered two lines of tracks, one going in the general direction of the Hunolt pasture and the other back towards defendant's house. The defendant admits that these tracks were made by himself, but his claim is that they were made on Saturday evening in going after his cows which fed in an adjoining field called the Styles pasture. Several persons who were in the Styles pasture on Saturday evening hunting for tracks saw defendant coming towards them from his granary. One of them says the defendant crossed the corn-field, came up to him in the pasture, and they had a conversation. When they parted defendant said: "I must get these cows and drive them off." The cows were then within thirty or forty yards. The state offered some evidence to the effect that defendant then had on gum boots, while the tracks were made with coarse leather boots. But there is other evidence that defendant had on leather boots early in the morning, that his feet got wet in the dew, and that he took them off and put on the gum boots, and that later in the day he put on the leather boots. It should be added here that these tracks in the corn-field were at least a quarter of a mile from the place where Hunolt was shot.

The defendant was arrested on the tenth of the month, and at that time gave his clothes, knife and pistol to the sheriff, who said the pistol did not show indications of recent firing and was loaded with cartridges. At the *post-mortem* examination a leaden ball was found on the floor. It was bloody and had evidently dropped from the body of the deceased. The evidence tends to show that it had been a round and not a cartridge ball, and that it would not fit the defendant's pistol. The defendant's pocket-knife was exhibited to the jury, and there is evidence that it had some red streaks on it; but it is not shown that the coloring was from human blood; and there is other evidence that his wife had used this knife a few days before the fourth to kill and clean a turtle to make soup for defendant.

The evidence for the state shows that the left hand of the deceased was powder-burned and the left chin was full of unburned grains of powder. The fatal bullet, as before stated, entered the right side and passed upwards. There is some evidence of horse-tracks in a circle, tending to show that the horse had struggled to free himself from a grasp. The state offered some evidence tending to show that deceased is a left-handed man, but most of the evidence is strong to the effect that he is right-handed, and lame in the left arm. Deceased was a large man weighing about one hundred and sixty-five or one hundred and seventy pounds; the defendant's weight is about one hundred and twenty pounds.

The witness Chenowith states that thirteen years before the death of Hunolt he had a conversation with the defendant in which the latter said he had been shot at; that he believed one Gay was the person, and was confident that Hunolt had hired Gay to kill him, defendant. This witness says defendant then suggested a method by which they could decoy both Gay and Hunolt and dispose of them without detection, that witness reproved defendant and the latter said he had spoken

hastily and asked to be pardoned.    Another witness says he had a conversation with the defendant, in 1882, at a dance in which defendant spoke of having a lawsuit with Hunolt, ånd said there had to be a settlement ; that defendant at the same time put his hand to his hip and said, "I have got the material here to settle it."

Gosney testified that he was working for the defendant in 1883, and defendant spoke of a difficulty with Hunolt about some rails.    The witness goes on to say : "He said Hunolt may be killed some day.    Suppose we would go and lay along the roads or by-paths in his field and kill him, and then when they would come to hunt for him we would go to hunt for him ; take as big a part as anybody, and go to the funeral and look into the grave, and talk to the people ; and says he, 'God bless you, how would they suspicion us.'"

About the first of January, 1886, the defendant and his wife, when starting home from an evening entertainment at Hager's Grove, were assaulted by six or seven boys, Hunolt's boy being one of them.    Defendant had them arrested and two or three of the boys were discharged, so as to them the costs fell upon defendant. The constable went to collect the costs, and he says defendant then blamed the deceased for the trouble, and stated that he, defendant, was in danger of being assassinated, and that he had a shotgun, a musket and pistol and would be ready for them.    Speaking to another person of this trouble, defendant said :  "I am satisfied I am going to be killed, and Joe Hunolt is not going to do it; but he is going to have it done, going to have some of those boys do it."    There is other evidence of a like character ; and the proof shows that defendant and deceased had had three or four law-suits before justices of the peace.

Many of the witnesses spoke of the fact that the defendant appeared to be restless and uneasy on the evening of the fourth of June, the next day at the

inquest, and at the funeral, and at other places. These and other witnesses also show that he was a man of a restless disposition and disposed to be officious on all occasions. There is other less important evidence which we need not detail.

1. In the disposition of the question whether the trial court should have directed a verdict for the defendant, it is to be remembered that it is not our province to try this case on its facts. This observation will dispose of much argument pressed upon us by the one side and the other. It is sufficient for our purposes to determine what inferences may be drawn from the evidence. It is of course the duty of the trial court to say whether there is any evidence entitling the state to go to the jury, and the ruling upon that question is open to review here. The rule even in criminal cases is, that before this court will relieve on the ground that the verdict is not supported by the evidence, there must be either a total failure of evidence, or it must be so weak that the necessary inference is, that the verdict is the result of passion, prejudice or partiality. *State v. Cook*, 58 Mo. 548; *State v. Musick*, 71 Mo. 401; *State v. Zorn*, 71 Mo. 415; *State v. Thomas*, 78 Mo. 342.

The mass of evidence in this case showing repeated expressions of ill-will and threats on the part of defendant towards deceased was competent and properly received by the court. These declarations go to show the feeling entertained by defendant towards deceased. It is true some of the declarations were made thirteen and more years before the deed in question, but they were continued down to a later period, and as a whole show a long hostility towards deceased, and the weight to be given to them is therefore strengthened rather than weakened by the lapse of time. Besides this we have often held that the competency of threats as evidence against the defendant and declarant is not affected by

their nearness or remoteness to the deed in question. *State v. Adams*, 76 Mo. 357 ; *State v. Grant*, 79 Mo. 137; *Carver v. Huskey*, 79 Mo. 510 ; *State v. McNally*, 87 Mo. 650. There is evidence tending to show that the defendant is much of an egotist and. disposed to make broad and reckless assertions without intent to put them into execution, and the jury may have attached little importance to his remarks. But all this was matter of comment to the jury.

But the special contention seems to be that aside from these threats there are no circumstances to connect the defendant with the crime of which he is charged. To this proposition we do not agree. The jurors may have concluded that the repeated assertions by defend-ant that he was at the squirrel trees when the shooting took place, and the talk about sending his wife to Shelbina, and his efforts to find his brother Gus. were things said and done to allay suspicion. Since he was not in robust health it would seem that he would have made these arrangements for his wife to go to Shelbina on Friday, and.not left them open so as to require him to make a trip of two or three miles before day-light the next morning.. Besides this the jurors had a right to consider his conduct and actions whilst in the Hunolt pasture the next day, and when at the inquest, and at the funeral. Without following out the details it is clear that we cannot and ought not to say that this judgment should be reversed for want of evidence to support it.

2. The defendant asked and the court refused to give the following instruction :

" No. 7. That although the jury may believe from the evidence in the cause that defendant made threats or declarations of intentions against deceased, Joseph Hunolt, before his death, yet if, upon a full review and consideration of all the evidence in the cause, they shall conclude that there is no evidence connecting defendant

with the assault and killing of deceased, Joseph Hunolt, other than such threats or declarations, then they will find defendant not guilty."

Best says: "Slight presumptions, although sufficient to excite suspicion, or to produce an impression in favor of the truth of the facts they indicate, do not, when taken singly, either constitute proof or shift the burden of proof." To this class, he assigns presumptions of homicide from previous quarrels. Best on Ev., by Cham., sec. 319. In speaking of declarations of intention, and after saying that such declarations and allusions are of great moment, when clearly connected by independent evidence with some criminal action, Wills proceeds to say: "But proof of such language cannot be considered to dispense with the obligation of strict proof of the criminal facts; for, though malignant feelings may possess the mind, and lead to intemperate and even criminal expressions, they nevertheless may exercise but a transient influence, without leading to action." Wills on Cir. Ev. (Am. Ed. 1853) top p. 62. Wharton states the law in these words: "Declarations of intention and threats are admissible in evidence, not because they give rise to a presumption of law as to guilt, which they do not, but because from them, in connection with other circumstances, and on proof of the *corpus delicti* guilt may be logically inferred. Evidence of this kind, for this purpose, is always competent." Whart. Crim. Ev. (9 Ed.) sec. 756. In *Jones v. State*, 57 Miss. 684, the accused had been convicted of murder on circumstantial evidence. He had made a threat that he would kill Anderson if his mistress went to live with him. She went on the next day, and Anderson was assassinated that night while sitting in his door. The defendant asked the court to instruct in substance, that if the accused did make the threat, still it was but a circumstance in the case and not sufficient of itself to warrant a conviction,

though it did not appear from the evidence that any other particular person committed the crime. For a refusal to give this and another like instruction the court had no hesitancy in reversing the judgment.

That Judge Hunolt was killed by some one in the commission of a crime is clearly established, and indeed is not a controverted fact in this case. But proof of the fact that the crime had been committed, and that defendant had made previous threats is not sufficient to warrant a judgment for murder. There must be some other evidence connecting defendant with the crime. Now, looking through this evidence, we can see that the jury may have resolved every circumstance put in evidence as a connecting link in favor of the innocence of defendant, and yet have found the defendant guilty on this evidence of threats. This they should have been told they could not do. It is to be remembered that there is no evidence tending to implicate any person other than the defendant, and it seems quite improbable that he did or could have killed Hunolt and removed the body without assistance. The evidence all points to the conclusion that Hunolt was killed by a pistol-shot at short range, and the bullet which fell from the body did not correspond with the caliber of defendant's pistol; nor was it of the kind used in his pistol. The evidence as to foot-prints is of little value, for they were found at a distance of over a quarter of a mile from the scene of the homicide, on defendant's premises, and in the line of the place where his cows fed, and there is direct evidence tending to show that these tracks were made after the murder. Whilst some witnesses speak of peculiar actions on the part of defendant, there is much evidence tending to show that these actions were the result of a restless disposition, and for him to have acted otherwise might have been a matter of equally unfavorable comment. In view of the different conclusions which the jury might have drawn from the evidence, and in the view

we take of this case, it is one in which such an instruction as that refused is peculiarly appropriate, and for the refusal to give it, or one to a like effect, the judgment will be reversed.

3.   Since this case must be remanded it is proper to consider some of the other questions that may again arise on a new trial.   Defendant by his eighth and eighteenth instructions asked the court to say that "evidence of casual statements or admissions by a party made in casual conversation, and to disinterested persons, are regarded by law as the weakest kind of evidence that can be produced, owing to the liability of the witnesses to misunderstand or forget what was really said or intended by the party."   These instructions were properly refused.   It is usual and proper in cases like the present one to give the jury a cautionary instruction, directing them to consider the evidence of verbal statements and admissions of the defendant with care and caution, taking into consideration the liability of the witnesses to misunderstand and to misquote the words used.   Of course the value of such evidence depends upon many circumstances. 1 Greenl. Ev., secs. 200, 214.   But it will not do to say that because the statements were made in a casual conversation to disinterested persons that they are therefore "the weakest kind of evidence that can be produced." Even under such circumstances they may be satisfactory evidence.   It is the province of the jury to weigh such evidence in the light of all the other evidence, and the usual cautionary instruction is sufficient.

4.   As the evidence now stands, it indicates murder in the first degree or no crime at all on the part of the defendant; but since the defendant was found guilty of murder in the first degree, the giving of the instruction upon murder in the second degree would not produce a reversal.   *State v. Talbott*, 73 Mo. 347; *State v. Smith*, 80 Mo. 516.

5.   The statement of the witness Lon Wheeler that he thought the man could be found in the field who committed the murder, should be excluded.   It is true this statement was made in the presence of defendant, but it was not such a statement as called for action or reply on the part of defendant.   Silence did not therefore amount to an admission.   1 Greenl. Ev., sec. 197.

6.   A witness was allowed to give evidence as to what defendant testified to on the first trial.   We can see no valid objection to such evidence.   Had the defendant made the statements out of court, evidence of them would have been admissible.   They are none the less admissible because made by defendant under oath.

For the reasons before stated, the judgment is reversed and the cause remanded.   All concur, except BARCLAY, J., who dissents.