## THE STATE v. HENDERSON, Appellant.

### Division Two, February 21, 1905.

1. **WITNESS: Name Not Indorsed on Information: Cumulative Evidence.** The failure to indorse upon the information the name of one witness is not a ground for excluding the evidence of such witness. Especially is this so where the evidence of such witness does not amount to a surprise, but is merely cumulative.

2. **MURDER: Corpus Delicti: Elements: How Established: Circumstances and Confession.** The *corpus delicti* in murder consists of two elements: the death of the person alleged to have been murdered, and the criminal agency of some one causing the death, both of which must be established. But the *corpus delicti* need not be established by direct and positive evidence, but may be shown by circumstantial evidence, when that is the best evidence obtainable, and provided that it is sufficient to satisfy the jury beyond a reasonable doubt. And the evidence in this case is examined and the *corpus delicti* held sufficiently established by the circumstances in evidence together with defendant's confession.

3. **————: Second Degree: No Evidence: Instruction.** Where there is no evidence to reduce the homicide below murder in the first degree, but all the circumstances show deliberation, premeditation, and a formed design to kill; and there is no provocation of any kind, no error is committed in refusing to instruct on murder in the second degree.

4. **INSTRUCTION: Comment on Evidence.** An instruction which is argumentative and a comment on the evidence is properly refused.

5. ———: **Cautionary: Statements of Defendant.** While the better opinion, upon authority and reason, would seem to be that it is not necessary to give the jury a cautionary instruction against the statements of a defendant, the practice of giving a general cautionary instruction that "the evidence of verbal statements and admissions of the defendant should be considered with care and caution, taking into consideration the liability of the witnesses to misunderstand and misquote the words used," has been so often approved by the Supreme Court that it is again assented to, especially as it is in behalf of the accused.

6. ———: ———: **Unnecessary In This Case.** Where, as in this case, the verbal admission and statements of defendant are made immediately before and after the homicide and only a few months before the trial, where there is no evidence tending to disprove such statements or admissions, and no effort made to impeach the witnesses, and where there is no material conflict in the testimony of the witnesses—no prejudice results from the failure to caution the jury against the evidence of the witnesses as to the admission and statements of the defendant. Especially should this be the ruling where, as here, the instructions are fair and liberal to defendant, and the court has instructed the jury that, in weighing the testimony of the witnesses, "they should take into consideration the conduct and manner of the witnesses on the stand, the opportunity of the witness to know the fact to which he or she testified, and his or her disposition to relate the same truly and correctly."

Appeal from St. Charles Circuit Court.—*Hon. H. W. Johnson*, Judge.

AFFIRMED.

*Charles J. Daudt* and *William F. Achelpohl* for appellant.

(1) The testimony of Mary Berkmeier, a material witness for the State, should not have been admitted, as her name was not endorsed on the information, although her testimony was known to the prosecuting attorney at the time he filed the informa-

tion. State v. Stifel, 106 Mo. 133; State v. Nettles, 153 Mo. 469. (2) The court erred in failing to instruct the jury on the law of the whole case, and in refusing to give instructions particularly requested by defendant. (a) Defendant was entitled to an instruction to the jury cautioning them in the consideration of repetition by witnesses of alleged statements, admissions and confessions of defendant. State v. Glahn, 97 Mo. 679; State v. Moore, 160 Mo. 460; State v. Howell, 117 Mo. 335; State v. Hendricks, 172 Mo. 668; 1 Greenleaf, Ev. (14 Ed.), sec. 200. (b) Defendant was entitled to an instruction on murder in the second degree. In the absence of evidence to the contrary, an intentional killing with a deadly weapon is presumed to be murder in the second degree. State v. Young, 119 Mo. 524; State v. Frazier, 137 Mo. 317; State v. Silk, 145 Mo. 240; State v. McMullin, 170 Mo. 630; State v. May, 172 Mo. 641. (3) The *corpus delicti* was not established. A conviction can not be based on the uncorroborated extrajudicial confession of a defendant. 1 Greenleaf, Ev., sec. 217; 1 Whart. Crim. Law, secs. 745-6; Wills, Circumst. Ev., sec. 6; Robinson v. State, 12 Mo. 592; State v. Scott, 39 Mo. 424; State v. German, 54 Mo. 526.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

The court gave nine instructions for the defendant and refused four, and in addition to those given for the defendant a number were given by the court of its own motion. The first instruction asked by the defendant and refused by the court was a comment on the testimony and properly refused. The other three were upon the question of murder in the second degree. No error was committed by the court in refusing instructions upon murder in the second degree, because there was no evidence to warrant such instructions. It has

been universally held that trial courts should not give an instruction upon murder in the second degree or upon manslaughter when the evidence does not, under any circumstances, justify the same. The instructions on murder in the first degree were sufficient. State v. Grant, 152 Mo. 57; State v. Thomas, 78 Mo. 327; State v. Bryant, 93 Mo. 373; State v. Williams, 141 Mo. 316; State v. Bank, 73 Mo. 592; State v. Cushenberry, 157 Mo. 168; State v. Frazier, 137 Mo. 317.

GANTT, J.—From a conviction of murder in the first degree defendant appeals.

The prosecution was by information filed by the prosecuting attorney of St. Charles county, on September 7, 1903, charging that defendant, on the twelfth day of April, 1903, willfully, deliberately, premeditatedly and of his malice aforethought did make an assault in and upon one Joseph Buckner, and a certain shotgun then and there charged with gunpowder and leaden balls, then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did discharge and shoot off, to, at, against and upon one Joseph Buckner, and that the said Allen Henderson, with the shotgun aforesaid, and the leaden balls aforesaid, out of the gun aforesaid, then and there by the force of the gunpowder aforesaid, by the said Allen Henderson discharged and shot off as aforesaid, then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did strike, penetrate and wound him, the said Joseph Buckner, in and upon the right side of him, the said Joseph Buckner, giving to the said Joseph Buckner then and there with the deadly weapon, to-wit, the shotgun aforesaid and the leaden balls aforesaid, discharged and shot out of the shotgun aforesaid, by the said Allen Henderson in and upon the right side of the body of him, the said Joseph Buckner, one mortal wound of the depth of six inches and of the breadth of eight inches, of

which mortal wound the said Joseph Buckner then and there instantly died.

It was further alleged that Price Edwards was then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought present aiding, helping, assisting, comforting and maintaining the said Allen Henderson, the felony and murder aforesaid in the manner and form aforesaid and by the means aforesaid at the time and place aforesaid to do and commit. "And so, Theodore C. Bruere, prosecuting attorney, aforesaid, *upon his oath* aforesaid, does say that the said Allen Henderson and Price Edwards, him, the said Joseph Buckner, at the time and place aforesaid, in manner and form aforesaid and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly and of their malice aforethought did kill and murder, against the peace and dignity of the State."

A second count with the same technical precision alleged the murder to have been committed by pouring coal oil on the deceased and setting the same afire and burning him up with the building in which he was living at the time.

The information was duly verified. A motion to quash was filed and overruled. The defendant was duly arraigned and pleaded not guilty.

The evidence tended strongly to prove the following facts:

Joseph Buckner, an aged negro man, lived by himself in the country near Wentzville, in St. Charles county. His dwelling consisted of three rooms, two below and one above. On Easter, the twelfth day of April, 1903, some of his children visited him at his home, and that afternoon he went to the house of his son, William Buckner, and took dinner with William and his wife, Agnes. He left their home about five o'clock in the afternoon, in his usual state of good health, to return home. That night his house was

totally destroyed by fire and his body consumed. Early next morning, his son William and his neighbors went to his home and discovered the charred remains of a human being in the ashes of the burnt building. The skull and trunk of the body were sufficient to show the form of a man and the metal portion of a knife he was known to carry was found by the body, and some metal buttons. From that day until the date of the trial in February, 1904, Joseph Buckner was never seen alive by any of his family.

It appeared that Price Edwards had married the daughter of Joseph Buckner, but the daughter had left Edwards and was not living with him at the time of the burning of her father's house; an unfriendly feeling existed between Edwards and the old man, Joe Buckner. Price Edwards lived about one fourth of a mile from the old man with his children. The evidence also established that the defendant Allen Henderson was in the habit of visiting Price Edwards frequently about the date of the homicide. That he and old Joe were at outs over the killing of Joe's dog by defendant.

There was evidence of threats made by the prisoner against deceased; that defendant had stated some weeks before the killing of old Joe that he had had trouble with the old man and had loaded his gun and revolver and had taken his razor and started to kill him, but he desisted, he said, because the Lord told him not to kill him. That some time in February, 1903, he said he intended to kill the old man just like he did his dog, and that pretty soon. To another witness, Johnson, he said he and the old man had had some words about a dog; that the old man accused him of killing the dog, and that he did shoot the dog. He said, "I will tell you, Johnson, that old man don't have to fool with me at all because I am going to kill him if it is the last thing I do." Johnson advised him not to kill him, but just whip him, to which defendant replied,

"No, I am going to kill him before the snow is off, the night ain't got no eyes." "You will read in the papers about me before this snow goes off."

The evidence of Price Edwards' two daughters was, in substance, that on the day their grandfather's house was burned, their father, Price Edwards, left in the morning and went to Wentzville and returned in the afternoon; that, after he left, the defendant, Allen Henderson, came to their house about noon and one Bruz Costilo also came that day about noon. All these parties were negroes. Defendant and Costilo lolled around the house after dinner until Price Edwards returned late in the afternoon. About six o'clock in the afternoon the defendant, addressing Price Edwards and Costilo, said, "Come on, boys, let's go. We are going to put a stop to it this evening, that they were going to kill old man Joe." The three left, Edwards saying he was going to Hubbard's. After they had been gone a few minutes, the defendant returned and got a shotgun and again left.

Later still, the defendant came back and got a can of coal oil that had been filled the day previous. About ten o'clock that night, Edwards and Costilo came back and took the children out to the edge of the field and they saw Joseph Buckner's house burning. Edwards saw it first. He heard the fire popping and said there was something afire. They went out and he said the old man's house was burning. Defendant also returned to the Edwards house with Edwards and Costilo after the fire began, but left immediately for his home some five miles distant. The evidence also tended to show that on Thursday before Easter defendant was at Edwards' house and a conversation between Edwards and defendant was detailed by Edwards' daughter. Defendant brought some percussion musket caps with him and said to Edwards, "Now you get the shot." Edwards said, "All right." Price Edwards

then said to deféndant, "You come back here Sunday and Bruz (Costilo) will be here."

Another daughter testified that on Thursday before the burning of old Joe's house, defendant was at her father's (Price Edwards) and Price told defendant to go and get in the hayloft and shoot him (Joseph Buckner) when he came to feed the next morning. Defendant said he would not do so unless Bruz Costilo was with him. Thereupon Price Edwards said, "Well, he would put it off until Sunday until Costilo came, and would have him there," and for defendant to be sure and come back Sunday morning. There was also evidence, in this connection, that Price Edwards brought some new buckshot which he said he got in Wentzville, and after loading the gun put the remainder of the shot in a dish in a wardrobe or cupboard.

There was also evidence that a day or two after the burning of old Joe's house, a musket was found in the loft upstairs of Price Edwards' house and the cap was exploded and had every evidence of having been recently fired, as it was still black and fresh, showing it had been recently exploded.

The evidence shows that neither Price Edwards or Bruz Costilo went to the relief of old Joe's house when they saw it burning, though one was the son-in-law and the other a brother of another son-in-law of the old man.

A coroner's jury was summoned by Dr. Miller, the coroner, and J. C. Brown was appointed constable by Dr. Miller. The coroner adjourned the inquest to the next day and advised Brown to get defendant if he could find him. Brown went in his buggy and found defendant about five miles from Wentzville and read a subpoena to him and suggested that he get in the buggy and ride to town with him. While riding to Wentzville, Mr. Brown testified defendant told him that Price Edwards, Bruz Costilo and defendant were together at Price's house and then went together to Joe Buckner's

with the intention of killing him, and after they had gone a hundred yards, they stopped and Price told defendant to go back to the house and get the gun, which he did, and then they walked to Buckner's house and they separated, two going together, Edwards and defendant, and Costilo by himself. Costilo went in a little front gate that led to the house from the county road, and the other two went into a big gate some thirty or forty yards east of the little gate, into a road between the orchard and the yard. The dog barked at them. Bruz went into the house and Price and defendant got into the yard and the dog was still raising a racket and old man Buckner came to the door (the south door) to see what was the matter and he, the defendant, shot him. He said he fired the shot, that Price was standing at his side, and defendant hesitated about doing it, and Price nudged him and said, "Shoot, shoot," and then he shot. After Brown and defendant reached Wentzville that night, and before defendant was arrested, Brown took defendant to Ball's livery stable, and there defendant repeated his confession to Brown and Mr. Ball substantially as he had made it to Brown.

Brown and Ball both testified they did not threaten defendant nor make him any promises. Ball does say he told defendant he thought Edwards was guilty, that he was sure of it from all the evidence, and the best thing for him to do was to tell the truth. He testified further that defendant said after they shot old Joe they went into the house and set the house afire. He said Bruz set the fire. There was also evidence that there had been a rain on Easter, and next day after the house was burned the distinct tracks of two men behind a lilac bush in the old man's yard were found. The defendant offered no evidence, save that of his mother that he was eighteen years old.

The instructions will be considered in the course of the opinion.

I. The first assignment of error is that the court erred in admitting the evidence of Mrs. Berkmeier because her name had not been indorsed upon the information, although she testified she had told the prosecuting attorney some time in May, before the information was filed, what her testimony would be.

This contention is predicated on section 2517, Revised Statutes 1899, which requires that, "When an indictment is found by the grand jury, the names of all the material witnesses must be indorsed upon the indictment; other witnesses may be subpoenaed or sworn by the State, but no continuance shall be granted to the State on account of the absence of any witness whose name is not thus indorsed upon the indictment, unless upon the affidavit of the prosecuting attorney showing good cause for such continuance."

That a complete failure to endorse the names of the material witnesses on an indictment may be taken advantage of by a motion to quash for such failure, was decided in State v. Roy, 83 Mo. 268.

In State v. Steifel, 106 Mo. 129, and in State v. Nettles, 153 Mo. 469, the statute requiring the indorsement of the State's witnesses was commended as a wise and just provision, but we have not held in any case that, where the prosecuting attorney has indorsed the names of the witnesses for the State, the omission of one name would afford a ground for new trial on the mere objection that the name of such witness had not been indorsed on the indictment or information.

There might be a case so flagrant as to amount to a surprise and upon a proper showing that the defendant, if advised that a particular witness would be called against him, would have been able to impeach his character or contradict his testimony by other witnesses, but we have no such case here. Mrs. Berkmeier's

evidence at most was merely cumulative on the subject of threats by defendant against deceased.

That ill-feeling existed between the defendant Henderson and the deceased over the shooting of a dog of the deceased was established by a number of other witnesses and the same is true as to threats. Moreover, Mrs. Berkmeier lived in the immediate neighborhood and her character could easily have been impeached if her evidence was untrue. So that in this particular case we have no hesitancy in saying there was no ground for excluding her evidence even if the statute did not in terms provide that other witnesses than those indorsed on the indictment or information might be sworn.

II. It is insisted that the *corpus delicti* was not established. The *corpus delicti* in murder consists of two elements, to-wit, the death of the person alleged to have been murdered, and the criminal agency of some one causing said death. Both of these must be established in a prosecution for murder or the conviction can not stand. As to the proof of the death of the person alleged to have been murdered, it is quite often stated that at common law the fact of death must be established by direct or positive evidence, but now by the weight of authority in this country, the fact of death, as well as of criminal agency, may be shown by circumstantial evidence, when that is the best evidence obtainable, and provided always that it is sufficient to produce conviction in the minds of the jury beyond a reasonable doubt.

The proposition is a grave one, for if a murderer may escape punishment for his crime by mutilating his victim so that he can not be identified or recognized, or, more effectually, burn the body, a premium is placed upon atrocity. In this record the evidence establishes that the old negro man, Joe Buckner, was on Easter, the twelfth day of April, 1903, alive and in

good health. He lived alone in his little cottage of three rooms about three miles from Wentzville in St. Charles county. One of his sons came to see him and ate dinner with him about noon. After dinner the old man went to visit another son and his family and remained until about five o'clock in the afternoon when he started for home. That night about ten o'clock the old man's house was discovered burning. Next morning the children and neighbors gathered at the ruins and the charred remains of a man were found in the ashes. By the side of the burnt body was the metal portion of a pocket-knife of peculiar shape, such as he was known to carry. From that day until the date of the trial, Old Joe Buckner was never seen alive. No motive was suggested why he should have burnt his house and fled the country. All of his children and grandchildren lived in the neighborhood. Had the house been destroyed by any other person in his absence, the natural and logical sequence would have been that the old man would have been the first to have discovered his loss and given the alarm, but he has never been seen since. After leaving his son's house for his home at five o'clock, he was not seen alive away from his home. Now it is the settled law of this State that full proof of the *corpus delicti,* independently of a confession, is not required. [State v. Patterson, 73 Mo. 713.] Now supplementing the foregoing facts with the other testimony of the case, we have, in addition to the disappearance of the old man, and the burning of the house in which he lived alone, and the finding of a burnt and charred body of a man, the fact, established by numerous witnesses, that shortly prior to the burning of the house, the defendant had shot and killed a dog belonging to the old man and an altercation over the shooting between the old man and the defendant had ensued, and following this encounter dire threats by defendant that he intended to kill the old man, and that soon. In addition to this, it was

clearly shown that Price Edwards was the son-in-law of the old man and that Edwards and his wife had separated and bad blood existed between the old negro and this son-in-law; that defendant was in the habit of visiting Price Edwards frequently and their ill-will to the old man created a bond of sympathy between them. Following in quick succession came an agreement between Edwards and defendant to kill the old man. The defendant brought the musket caps to Edwards' house and Edwards procured some buckshot and loaded his musket.

Sunday afternoon about six o'clock Edwards, Costilo and defendant started from Edwards' house, the defendant saying, ''They would kill old man Joe.'' They left and defendant returned and got the gun and later a can of coaloil. That night at ten o'clock these three had returned to Edwards' house and called the attention of Edwards' children to the burning house of Old Joe. Though only a quarter of a mile distant, neither of these men, nor any of the old man's granddaughters, made the slightest effort to go to his relief. Such indifference to the welfare of the lonely old man by his own relations indicates a deep-seated malice.

Everything logically pointed to the murder of Old Joe and the criminal destruction of his house to conceal the murder. The coroner at once began an investigation. Suspicion was directed to Edwards and defendant. Defendant was subpoenaed as a witness and on the way to Wentzville, where the inquest was to be held, the defendant confessed to Mr. J. C. Brown, a justice of the peace and cashier of the Bank of Wentzville, that he, Edwards and Costilo had gone to Old Joe's house that Sunday evening and attracted him to the door of his house, and defendant shot him at the instigation of Edwards and having killed him, they applied the coaloil which they had brought with them to the house and burned it.

In view of all the evidence it is insisted there was

not sufficient proof that Joseph Buckner had been murdered. To this we can not agree.

In People v. Palmer, 109 N. Y. 110, Judge FINCH in a careful review of the authorities reached the conclusion that the common law rule as to the *corpus delicti* never did include the identity of the victim, but that was left to indirect or circumstantial evidence. Lord STOWELL, in Evans v. Evans (1 Hag. Consist. Ct. 35-105), said, "if you have a criminal fact ascertained, you may then take presumptive proof to show who did it—to fix the criminal—having then an actual *corpus delicti.*"

In Will on Circumstantial Evidence, p. 374, et seq., it is said that direct and positive proof of the identity of the deceased is not required and Rex v. Cook is cited in which it appeared that a human body had been burned, but enough remained unconsumed to show that it was the body of a male adult and its further identification was founded upon circumstances, an important part of which was the finding in the possession of the prisoner articles belonging to the deceased. [2 Best on Presumption, p. 780.] The discussion need not be extended to a great length. In the celebrated case of Com. v. Webster, 5 Cush. 295, in which the defendant was charged with the murder of Dr. George Parkman, who had suddenly disappeared from his family and home in 1849, the identification stood mainly upon a block of teeth found in the furnace where part of the body was consumed. There was no direct recognition of the body by anyone, but circumstances were strong and the defendant was convicted.

In State v. Lamb, 28 Mo. 218, the dead body of the wife whom Lamb confessed to have murdered was never found, as he threw it into the Mississippi river after killing her.

Judge SHERWOOD, in State v. Patterson, 73 Mo. 712 and 713, pointed out that while extrajudicial con-

fessions alone are not sufficient to support a sentence of murder, yet when a confession is made and the circumstances related therein correspond with those proven to exist, it will be for the jury to determine the guilt of the accused. In this case the threats, the ill-will, the preparation of the gun, the starting of the three negroes with the avowed purpose of killing Old Joe, the reasonable and natural inference that he was at his home, the burning of the house, the finding of the charred remains of a man in the ashes of the old man's home, the confession, corresponding with the otherwise established facts—all together furnish ample proof of the murder of Joseph Buckner by the defendant and his confederate in the crime. [State v. Howell, 100 Mo. 628; State v. Tettaton, 159 Mo. 354; State v. Coats, 174 Mo. 396.]

III. Error is assigned on the failure and refusal of the court to instruct on murder in the second degree. We think it too plain for serious discussion that there was not a syllable of evidence reducing the homicide below murder in the first degree. The jury were necessarily bound to find their verdict on the evidence. If they believed the evidence, it established a case of murder in the first degree and nothing else. It was a deliberate, premeditated, malicious killing if perpetrated by defendant as the evidence, coupled with his confession, tended to prove it. If the jury rejected this evidence, then there was no middle ground and they should have acquitted him. Where all the circumstances show deliberation and premeditation and a formed design to kill in furtherance of some fancied wrong or out of a spirit of revenge and there is not even a verbal provocation of any kind, the killing is murder in the first degree. If the defendant killed the deceased in the circumstances detailed in his own confession, it was a murder perpetrated by lying in wait and falls peculiarly within the class of murders defined by our statute as murders in the first degree.

There was no error in declining to submit murder in the second degree to the jury.

IV. Lastly it is urged the court erred in refusing an instruction asked by defendant as follows:

"The jury are instructed, with respect to all verbal confessions, admissions, declarations and conversations, that evidence of them should always be received with great caution. Consisting, as it does, in the repetition of oral statements, it is subject to much imperfection and mistake; the party himself being misinformed or not having expressed his own meaning, or the witness having misunderstood him, or from the infirmity of the human memory. It frequently happens also that the witness, unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. And especially where the witness has not heard all the admissions, declarations or conversation, and testifies only to parts thereof, should caution be exercised. It then becomes very unsatisfactory and imperfect evidence—the lowest grade of evidence."

The circuit court refused this instruction because it was a comment on the evidence and argumentative. That its action to that extent was proper there can be no question, a much less objectionable instruction of the same nature having been expressly condemned in State v. Glahn, 97 Mo. 693, but it is pressed on us that notwithstanding the instruction asked was an argument in itself, yet the circuit court should have given a cautionary instruction in correct form of its own motion, or at least have taken the incorrect instruction as a prayer for a proper instruction. Did the facts in evidence call for a cautionary instruction in addition to those which the court had given, and if so, in what form? At the request of defendant the court gave nine instructions requiring the jury to find beyond a reasonable doubt every fact necessary to constitute the

crime before they could find him guilty—as will appear from the following:

"2.   The jury are instructed that the information in this case is a mere formal accusation or charge against the defendant and is no evidence whatever of the guilt of the defendant, and no juror should permit himself to be to any extent influenced against the defendant because or on account of the information in this case.

"3.   The jury are instructed that, in order to warrant a conviction in this case, the prosecution must, by evidence so clear and convincing as to satisfy the minds of the jury beyond a reasonable doubt, establish the fact that Joseph Buckner is dead, that his death was brought about by the criminal act of some one else, and that the defendant, Allen Henderson, perpetrated such criminal act; and if the jury or any one or more members thereof entertain a reasonable doubt, as defined in other instructions herein, as to whether any or all of these facts have been established, then in such case the jury cannot convict the defendant.

"4.   The jury are instructed that the prosecution has undertaken to prove that the defendant, Allen Henderson, killed one Joseph Buckner by shooting or burning and that certain bones, burnt flesh and ashes, claimed to have been found in the ruins of the house of said Buckner, were the last and only remains of the body of said Buckner.  They are further instructed that without proof positive satisfying the minds of the jury beyond all reasonable doubt that said Buckner is dead, that said bones, flesh and ashes were the last remains of the body of said Buckner, and that said Henderson killed said Buckner by shooting or burning, there can be no conviction in this case.  So that, if the jury have any reasonable doubt, as defined in other instructions, whether said Buckner is dead, and that said bones, flesh and ashes were the last remains of his body, or if they have any reasonable doubt that said

Henderson killed said Buckner by shooting or burning, then they must acquit the defendant.

"5. The mere fact that the deceased came suddenly to his death is not sufficient to warrant you in finding that his death was the result of a criminal act. The prosecution has undertaken to prove that one Joseph Buckner is dead and that his death was caused by injuries inflicted upon him by the violence of the defendant, Allen Henderson, and unless such proof has been made to your satisfaction beyond a reasonable doubt, as defined in other instructions, then you are bound to presume that said Buckner, if dead, died from some other cause, no matter whether the evidence shows what that cause was or not.

"6. The court instructs the jury that the defendant is presumed to be innocent, and this presumption attends and protects him at every stage of the case until it is overcome by evidence which proves his guilt beyond a reasonable doubt, as defined in other instructions. Mere probabilities are not sufficient to warrant a conviction, nor is it sufficient that the greater weight or preponderance of the evidence supports the theory of guilt, nor is it sufficient that, upon the doctrine of chance, it is more probable that the defendant is guilty than otherwise, but the State must go further to warrant the conviction of the defendant, and must prove his guilt in the manner and form charged in the information by proof so clear and satisfactory as to leave no reasonable doubt of defendant's guilt, as defined in other instructions of the court.

"7. The jury are instructed that the defendant is presumed to be innocent of the crime charged against him, and this presumption attends him all through the progress of the whole trial, until it is overcome by evidence proving his guilt beyond a reasonable doubt, as defined in other instructions of the court. And the jury are instructed that this presumption of innocence of the defendant is not a mere form which may be dis-

regarded by the jury at pleasure, but that it is an essential and substantial part of the law of the land and binding on the jury in this case, and it is their duty to give the defendant in this case the full benefit of this presumption and to acquit him, unless they feel compelled to find him guilty under the law and evidence convincing them of his guilt beyond a reasonable doubt, as already defined.

"8. The jury are instructed that, to warrant a conviction in this case, the testimony must be of such nature that it is not only altogether consistent with the theory of the defendant's guilt, but absolutely inconsistent with any reasonable theory of his innocence; that is, that all the circumstances in the evidence must not only be consistent with the theory of the defendant's guilt, but the evidence must be so clear as to satisfy the jury beyond a reasonable doubt, as defined in other instructions, that all the facts are consistent with each other and absolutely inconsistent with the innocence of the accused upon any reasonable theory, and incapable of explanation upon any other reasonable theory than of his guilt.

"9. The jury are instructed that, when evidence fails to show any motive on the part of the defendant to commit a crime charged, this is a circumstance in favor of his innocence, and, in this case, if the jury find, upon a careful examination of all the evidence, that it fails to show any motive on the part of the defendant, Henderson, to commit the crime charged against him, then this is a circumstance which the jury ought to consider in connection with all the evidence in the case, in making up their verdict.

"In order to ascertain whether or not a motive existed on the part of said defendant to commit the crime charged against him, they will take into consideration all the evidence in relation to the association, relation and deportment of said defendant and the deceased with and towards each other."

In addition to the instructions defining murder in the first degree and explaining and defining the words "willfully," premeditatedly," "deliberately," "malice," and "malice aforethought," as often approved by this court, the court gave the following instructions of its own motion:

"4d. You are further instructed that you are the sole judges of the weight and value of the evidence and the credibility of the witnesses. In passing upon such weight, value and credibility, you may take into consideration the conduct and manner of the witness on the stand, the probability or improbability of his or her statements, the opportunity of the witness to know the facts to which he testifies and disposition to relate them truly and correctly or otherwise, the prejudice or bias of the witness, if any, either for or against the accused, the feeling of the witness, if any, for or against the accused, as well as all the facts and circumstances given in evidence. And you are further instructed that if you believe any witness has intentionally testified falsely to any material fact in the case, then you are at liberty to reject the whole or any part of the testimony of such witness.

"5e. The jury is further instructed that the statements of defendant, if any, you believe from the evidence were made since the alleged offense should be considered by the jury altogether; those against his interest, if any, are presumed to be true because against his interest; those favorable to him the jury are not bound to believe because proved by the State, but the jury may believe or disbelieve them as they may be shown to be true or false by other evidence in the case or bear in themselves the intrinsic evidence of truth or falsity.

"6f. You are further instructed that the law presumes the defendant innocent of the offense here charged against him; and the burden of proof rests on the State to show to the jury from the evidence in the

cause his guilt beyond a reasonable doubt.   If you
have a reasonable doubt of defendant's guilt, you
should acquit him; but a doubt to authorize an acquit-
tal on that ground ought to be a substantial doubt
touching defendant's guilt, and not a mere possibility
of his innocence.''

Counsel for defendant cite us to State v. Glahn,
97 Mo. 693, in support of their contention that the court
erred in not giving such cautionary instruction.   As
already said, in that case this court disapproved an in-
struction much less argumentative than the one offered
in this case.   In that case there was an immense amount
of casual and inconclusive statements in evidence and
reaching back over many years.   After condemning
the instruction which asked the court to tell the jury
that ''evidence of casual statements or admissions by
a party made in casual conversation, and to disinter-
ested persons, are regarded as the weakest kind of
evidence,'' Judge BLACK, speaking for the court, said:
''It is usual and proper in cases like the present to
give the jury a cautionary instruction, directing them
to consider the evidence *with caution*, taking into con-
sideration the liability of the witnesses to misunder-
stand and misquote the words used. . . .   But it
will not do to say that, because the statements were
made in casual conversations, they are therefore 'the
weakest kind of evidence that can be produced.' ''

In State v. Moxley, 102 Mo. l. c. 390, it was said:
''These casual conversations in which the defendant
is supposed to have made divers damaging admissions
*had occurred some four years before* they were dis-
closed in evidence, and a cautionary instruction such
as that asked here was entirely appropriate and should
have been given; its refusal was error;'' but the judg-
ment was reversed for various other reasons, one at
least of which has since been disapproved with the con-
sent of the author of that opinion.   In State v. Howell,
117 Mo. l. c. 325, a general cautionary instruction was

given without comment by this court, one way or the other.

The most recent case on this subject is State v. Hendricks, 172 Mo. 654. In that case an instruction prayed by the defendant in practically the same objectionable form as the one offered in this case and now under consideration was condemned, but it was ruled that a proper cautionary instruction should have been given and it was error not to have done so. As the basis of this instruction, Fox, J., says, "There was some evidence of statements made by the defendants or at least one of them." This is the first case within our knowledge where a reversal has hinged upon the naked failure to give such a cautionary instruction. The functions of the judge and those of the jury are clearly defined in our system of law. It is for the jury to *weigh* the evidence, and it is the province of the court to pass upon its competency.

Whenever the court undertakes to tell a jury what *weight* should be given to any evidence, to that extent it invades the lines marked out for the jury.

Judge THOMPSON in his work on "Trials," vol. 2, sec. 2431, commenting upon this exact question, most aptly remarks: "Cases where such cautionary instructions have been given, and where convictions have followed which have been affirmed, cannot, therefore, be cited as authorities in favor of the propriety of giving such instructions; since the error, if any, was in favor of the prisoner." The learned author then proceeds to point out that the instruction which it is claimed should have been given in this case has been condemned by many courts in this country as an invasion of the jury's prerogative.

In numerous cases it is held that Greenleaf's statement, embodied in defendant's instruction above copied, is a matter of argument and not a rule of evidence upon which the courts should instruct juries. In Collins v. State, 20 Tex. App. 399, l. c. 420, the

court says: "To have instructed the jury as requested by defendant that 'the confessions of a defendant are to be received *with caution'* would have been error, because it would have been a charge upon the weight of evidence."

The foundation for this cautionary instruction is found in Greenleaf's Evidence, sec. 200, but, again and again, it has been .pointed out by some of our ablest courts that the statements of Greenleaf are after all but matters of argument and not rules of law or evidence; that while it is a matter of common knowledge that such evidence is liable to be erroneous, yet such conclusion is only an inference of fact which must be made by the jury and not a presumption of law to be declared by the court. Nowhere is it better stated than by the Supreme Court of California in Kauffman v. Maier, 94 Cal. l. c. 283, as follows: "The reasons which are to be urged in favor of receiving such statements with caution are based upon human experience, and vary in strength and conclusiveness with the facts and circumstances of each case, and their sufficiency in any particular case is an inference which the reason of the jury makes from those facts and circumstances; .but there is no rule of law which directs the jury to invariably make such an inference from the mere fact that the proof of the admission is by oral testimony. That deduction called a presumption which the law expressly directs to be made from the particular facts is uniform, and not dependent upon the varying conditions and circumstances of individual cases. To weigh the evidence and find the facts in any case is the province of the jury, and that province is invaded by the court whenever it instructs them that any particular evidence which has been laid before them is or is not entitled to receive weight or consideration from them." [See, also, Unruh v. State ex rel., 105 Ind. 117.]

In Johnson v. Stone, 69 Miss. 832, the Supreme Court of Mississippi said: "The law knows nothing

about the relative value of admissions; that is a matter for the consideration of the jury. Counsel may argue the probable value of such admissions to the jury, and show the circumstances under which they were made as affecting their weight; but the fact that this may be done, or that a text-writer or court states in argument 'that an admission casually made is of little weight,' does not make it a proper subject to be given in charge to the jury.''

In State v. Patrick, 3 Jones' Law (N. C.) 443, the Supreme Court of North Carolina held it was not error to refuse to charge that confessions are to be received *with caution.*

In South Carolina, where counsel are permitted to read law books to the jury, subject to the right and duty of the court to charge the law, in Moore v. Dickinson, 39 S. C. 445, counsel had read to the jury section 200, Greenleaf's Evidence. After alluding to the fact that counsel had quoted Greenleaf, an author of the highest respectability, the circuit court charged the jury: ''But what Mr. Greenleaf says there is not law to you, but is the logical argument of a very learned judge of great experience, and if it corresponds with your experience, . . .    may or may not be adopted by you in passing upon the facts in this case.'' The Supreme Court held the charge was correct and said, ''The weight of the testimony is wholly a matter for the jury.''

In Garfield v. State, 74 Ind. 64, this same section of Greenleaf was again called into play and the Supreme Court held it was improper for the court to give it as an instruction.

It must be conceded that casual statements, as in Glahn's case, running over a number of years, and those of Moxley's case, four years old, are apt to be inaccurately remembered, but after all the jury are there for the purpose of weighing these very considerations. The proposition here is that, because the court

did not caution the jury against statements made immediately before and after the homicide, and in a case where the witnesses were detailing statements made only a few months before the trial, and in a case where there was not the slightest evidence tending to disprove such admissions, and no effort made to impeach the witnesses, and where there was in fact no material conflict between the witnesses, the court, although it had expressly charged the jury that, in the weighing of all witnesses' testimony, without individuating any particular witness, they should take into consideration the conduct and manner of the witness on the witness stand, *the opportunity* of the witness to know the facts to which he or she testified, and his or her disposition to relate the same truly and correctly or otherwise, etc., committed reversible error in not giving such an instruction.

While the better opinion, upon authority and reason, would seem to be that it is not necessary to give the jury a cautionary instruction against the statements of a defendant, the practice of giving a general cautionary instruction that "the evidence of verbal statements and admissions of the defendant should be considered with care and caution, taking into consideration the liability of the witnesses to misunderstand and misquote the words used," has been so often approved by this court that we yield our assent thereto, especially as it is in behalf of the accused. A similar rule has been approved as to the testimony of accomplices. [State v. Harkins, 100 Mo. 666; State v. Black, 143 Mo. 171; State v. Jackson, 106 Mo. 174.]

But we have often ruled that, while an instruction may be called for in some cases, and it may even be error to fail to give it, it does not necessarily follow it must be given in every case. Whether such a cautionary instruction should be given must depend on the facts developed in the case. Where the statements or

admissions are merely casual statements extending over a long time, or there is a material variation between the witnesses, or the same conversation is differently narrated by different witnesses, or there is a direct conflict as to the statements or admissions, or the circumstances are such to indicate the witnesses may not have heard all that the defendant said, or were not in a position to hear all that the defendant said, or considerable time has elapsed and the memory of the witnesses may not be clear for that reason, then the instruction, as guarded in State v. Glahn, 97 Mo. 678, should be given if requested, but in this case, in view of the exceedingly fair, strong and liberal instructions given in behalf of the defendant, and especially as the court instructed the jury that, in weighing the testimony of the witnesses, "they should take into consideration the conduct and manner of the witnesses on the witness stand, the *opportunity of the witness to know* the facts to which he or she testified, and his or her disposition to relate the same truly and correctly," we are satisfied no prejudice resulted from the failure to caution the jury against the evidence of the witnesses as to the admissions and statements of the defendant.

These witnesses were almost wholly disinterested and no attempt was made to impeach them or to contradict their testimony by proof of facts to the contrary of what they had sworn, and the statements were in no sense casual, but were the direct and positive statements of the defendant fully corroborated by facts in evidence outside of his admissions.

We are convinced that such a cautionary instruction as was approved in Glahn's case would not have changed the verdict of the jury.

On the whole, we think the defendant had a fair and impartial trial and the aid and assistance of able and careful counsel who guarded his interest at every point, and we find no reversible error in the record.

The judgment of the circuit court must be and is affirmed and the sentence which the law pronounces is directed to be executed.

All concur.